IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 23, 2025 Session[1]

# IN RE BRAXTON M.

**Appeal from the Chancery Court for Gibson County
No. 24741     Michael Mansfield, Chancellor**

_____

**No. W2024-00762-COA-R3-PT**

_____

This appeal involves a mother and stepfather's petition to terminate the parental rights of a father to his surviving child after the death of the parties' other child. The petition alleged two grounds for termination of parental rights – abandonment by failure to support and severe child abuse. The chancery court found that neither ground had been proven by clear and convincing evidence. The court also reviewed the statutory best interest factors and concluded that it was not in the best interest of the child for the father's parental rights to be terminated. The mother and stepfather appeal. For the following reasons, we reverse and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed
and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which KENNY W. ARMSTRONG, J., joined. VALERIE L. SMITH, J., filed a separate opinion concurring in part and dissenting in part.

Heather C. Grewe, Pinson, Tennessee, and Jasmine McMackins Hatcher, McKenzie, Tennessee, for the appellants, Gary T. and Alicia T.

David W. Camp, Jackson, Tennessee, for the appellee, Tyler M.

Bob C. Hooper, Brownsville, Tennessee, Guardian ad Litem.

## OPINION

### I.   FACTS & PROCEDURAL HISTORY

_____

[1] This case was reassigned to this judge on or about January 28, 2026.

Tyler M. ("Father") and Alicia T. ("Mother) married in 2017. At the time of the marriage, both parties were in their early twenties, and Mother was expecting their first child. She gave birth to a son ("Brother") in July 2017. The child at issue in this appeal, Braxton, was born in June 2019. By all accounts, the parties' brief four-year marriage was not a healthy relationship. There were numerous verbal altercations witnessed by the children, various periods of separation, and frequent discussions of divorce throughout the marriage. They also experienced financial difficulties and housing instability, living at four different addresses in four years. Father changed jobs several times as well, working as a pipe loader, welder, police officer, and for the Tennessee National Guard as a power generation specialist. By the summer of 2021, Father was working the night shift in industrial maintenance for an employer in another county, and Mother was working during the day. According to Mother, the parties "could not be within the same room together" at this point, so they essentially divided the day so that they would be home at different times.

On August 19, 2021, Mother informed Father via text message that she was going to file for divorce. That evening after work, she picked the children up from daycare and took them home to allow them to spend some time with Father before he left for his night shift. She stayed outside in her car to avoid seeing Father. However, when she attempted to go inside, the door was locked and she could not enter. She tried to call and text message Father but received no response. As a result, Mother called law enforcement. The Sheriff's Department responded, and Mother was permitted to enter the home. Father claimed that he had on headphones and did not know she was locked out. He informed the officers that Mother had a house key but the handle was "kind of a little funny" and had to be pulled a certain way for the door to open. He left for work for the night before the officers left, and he and Mother had no further communication that evening.

The next morning, Mother took the children to daycare and went to work as usual, before Father returned from work. After Father's shift ended, he went and obtained an order of protection against Mother, prohibiting Mother from any contact with him and prohibiting her from any contact with their two children. Mother was served with the order of protection while at work and was prevented from picking up the children from daycare that day, as officers removed the children's car seats from her vehicle. She would never see Brother alive again. Father picked the children up from daycare and stayed with them at the parties' home that night, while Mother slept on a friend's couch. Father would later admit that there was no physical abuse during the marriage and that Mother did not pose any risk of harm to him or to the children.

The next day, August 21, 2021, Father spent the morning on a telephone call with a female he had "met" on Facebook and exchanged messages with a few days earlier. This individual worked as a 911 dispatcher in another county. Father talked with her for 51 minutes, as he got the children ready at the parties' home in Milan and drove them to Jackson. Along the way, Father stopped to get gas and bought the children apple juice, a

corn dog, and "gummies." He left the children, ages two and four, unattended in his Dodge Ram truck for about ten minutes at the gas station.[2] He then continued his drive to Jackson, all the while talking to the dispatcher. He informed her that he was going inside a salon to get his eyebrows waxed and would call her back. While Father was inside the salon, he left the two boys alone in his truck with their snacks, with the vehicle running and the windows up. The truck was parked in front of the door where Father could see it. The boys were fastened in their car seats in the back seat. Father checked in at the salon at 9:45 a.m. and checked out at 10:22 a.m. Thus, the children were left unattended in the vehicle on this occasion for a period of 35 to 40 minutes.

What happened over the next ten minutes is the subject of some dispute. Phone records indicate that Father made another telephone call to his dispatcher friend at 10:24 and that this call lasted eight minutes. Father admits that phone records show this call did occur, but he claims he does not remember it. When police officers interviewed the dispatcher later that day, she described the 10:24 phone call as follows:

> [THE DISPATCHER]: Yes. He called me after he left Sports Clips, I believe.
> INVESTIGATOR WILLIAMS: Okay.
> [THE DISPATCHER]: Was it Sports Clips? Somewhere to get his eyebrows waxed.
> INVESTIGATOR WILLIAMS: Got you, got you. Do -- and I know you probably don't remember exactly everything that you-all talked about or anything like that, but did he say anything in particular or anything? Do you --
> [THE DISPATCHER]: He said that his youngest one had threw up on his self and that his oldest one started, like, breathing really funny. And he said that he was, like, blood red, almost like he was trying to throw up.
> INVESTIGATOR WILLIAMS: And this was –
> [THE DISPATCHER]: And --
> INVESTIGATOR WILLIAMS: And you said this was after he got his eyebrows done?
> [THE DISPATCHER]: Yes.
> INVESTIGATOR WILLIAMS: Got you.
> [THE DISPATCHER]: And then he kept trying to get his attention and he wouldn't respond. He just kept making like this, like gasping, like breathing

---

[2] Father had just purchased the Dodge Ram about three months earlier with the parties' income tax refund. Father informed Mother that the truck had an exhaust problem and "that's why the person was selling it for the price that he was." It was reportedly so loud "[y]ou could hear it coming from a mile away." According to Mother, she asked Father about the issue but ultimately trusted his judgment because he knew more about exhaust than she did, having worked as a diesel mechanic. According to Father, he "didn't really find one or see an exhaust leak that was on the truck, and we didn't have any money to set aside for a situation like that," as the parties were "both struggling, trying to get through at that time."

noise. And he said he was really red. And then he told me he would call me back. And that was about the gist of the conversation because he said his youngest one had already threw up.

INVESTIGATOR WILLIAMS: Right. Can you – can you look in your phone and give me the time? I know you said it was about 10:30.

[THE DISPATCHER]: I can. Hold on one second. 10:24.

INVESTIGATOR WILLIAMS: 10:24 was when he called you?

[THE DISPATCHER]: Yes.

INVESTIGATOR WILLIAMS: And he said that – said he just got his eyebrows done. And said one of them had thrown up and the other one was not looking good?

[THE DISPATCHER]: The littlest one had already threw up and they was in the truck. And the oldest one, like I said, started making, like, this breathing noise, like he was trying to breathe. And he said he was really, really red. And he kept saying he didn't know what was going on. And he kept trying to get his attention --

INVESTIGATOR WILLIAMS: While you was on the phone with him?

[THE DISPATCHER]: And he wouldn't ever --

INVESTIGATOR WILLIAMS: Got you. How long – how long – what's the duration on you-all's call there? How long did you all talk on the phone with him?

[THE DISPATCHER]: Let me see if I can tell you. It was on Facebook Messenger, so I don't know if it will tell me an exact -- let me see.

INVESTIGATOR WILLIAMS: I know on that -- on that message --

[THE DISPATCHER]: Eight minutes.

Father, on the other hand, claims that both children were "fine" when he came back to the truck after his eyebrow wax aside from the fact that Braxton had "spit up" on himself. Father assumed that the "spit up" was "from eating all the gummies."

Video footage shows that Father entered another salon at 10:33, which was eleven minutes after he checked out of the first salon. The second salon was "two or three buildings down" in the same "strip" of stores. He left the children unattended in his vehicle with it parked in front of the door while he got a haircut. He exited the establishment over an hour later, at 11:38 a.m. When Father got into the vehicle, he saw that Braxton, the two-year-old, had "spit up all over the front of him." So, he decided to drive home rather than continuing with their errands. According to Father, four-year-old Brother, who was autistic and nonverbal, said the word "cup," but when Father attempted to hand his cup to him, he did not take it. Father started driving toward home but looked into the back seat and saw that Brother had his head "tucked" and was "staring up to oblivion." He reached back to shake him but could not get his attention. He then called 911 and stopped the vehicle. He attempted to do CPR unsuccessfully. When paramedics arrived, they determined that Brother's chest was not rising and used a device to retrieve "a piece of a corn dog that was

- 4 -

blocking his airway." He was pronounced dead at the hospital. Braxton was airlifted to another hospital for treatment, and Father was treated as well. Doctors determined that evening that the issue was carbon monoxide poisoning.

Father called Mother from the hospital, but Brother was already deceased by the time she arrived. She was allowed to see Brother but could not touch him or hold him. Braxton had already been airlifted to a Memphis hospital, so Mother went there to be with him. However, the order of protection was still in place, so Braxton went home with Father that evening, while Mother returned to her friend's home.

That same evening, Father sent a message to his dispatcher friend telling her that Brother had passed away. Police investigators contacted the dispatcher that evening upon learning from Father that he had talked with her earlier in the day. She told them that she was aware of what had happened and described her phone calls with Father on his way to Jackson and at 10:24 that day, as set forth at length above. The investigators asked to meet the dispatcher in person in order for her to give a recorded statement, which she did. She told officers that the children were "fine this morning" when she spoke with him, but when he called after getting his eyebrows waxed, the youngest had thrown up and "[Father] had said that the oldest one started acting really funny and started turning, like, red." She said, "I could hear him making, like, really weird, like, breathing noises." The dispatcher informed the investigators that she had never met Father in person and had only been communicating with him for about three days.

On the night of Brother's death, Mother made a Facebook post about his passing. She wrote,

> So I'm going to say this one time and one time only, what happened to [Brother] is not anyone's fault. It was a freak accident. So I would greatly appreciate it if people would stop blaming Tyler because Tyler also had to get treated for carbon monoxide poisoning. His truck had an exhaust leak, as many of you know. It's not like he purposely knew there was carbon monoxide coming into the truck. You can't smell it, see it, or taste it. And that's what makes it so deadly and dangerous. Now is not the time to be hateful or point fingers. Investigation has been done, and nobody is at fault. Hateful comments and finger pointing is not going to bring my baby back.

However, Mother would later explain that when she made this post, she "was not aware of how the events happened that day." According to Mother, the only information she had about Brother's death at that point was what Father had told her, and she eventually learned that his story "was not true." It is undisputed that Father never told Mother that he left the boys alone in his vehicle that day.

The day after Brother's death, Father dismissed the order of protection. Mother,

Father, and Braxton initially lived together at Mother's friend's house for about a month as they grieved and attempted to reconcile. They ultimately determined that their relationship could not be salvaged. Father and Mother tried to be cordial for a time and agreed to utilize a "50/50" parenting schedule for Braxton. Father briefly went back to the home where the parties had lived in Milan, but he soon moved due to the expense and memories of Brother there. Father moved into another home around October, and at some point, he began a new job working at a factory as a diesel mechanic. Mother filed for divorce on November 5. She lived with her grandmother in Henderson for a time.

Despite their initial agreement on a 50/50 schedule, Father claims he "exercised essentially primary control over Braxton" during these few months and estimates that Braxton spent "probably close to 90 percent of the time" at his home. Mother claims that is because Father disregarded her requests to see Braxton. After Mother had a disagreement with her grandmother, she moved in with her current husband ("Stepfather") in January 2022. Father admittedly denied Mother access to Braxton at that point because she was living with Stepfather, deciding that "she couldn't see him no more." Mother went to see her divorce attorney about the situation but was told that it was not necessary to enter a temporary parenting plan at that point due to the expectation that Father was about to be arrested. Father was arrested on February 28. He was charged with first degree murder of Brother, aggravated child abuse/neglect/endangerment, reckless homicide, child abuse/neglect/endangerment, and two counts of leaving a child unattended in a motor vehicle. Braxton went to live with Mother and Stepfather and Stepfather's two children upon Father's arrest.

Father had no communication with Braxton at all while he was incarcerated, and there was some type of order by "the State" prohibiting him from contacting Braxton prior to his release. Father did not send any financial support to Braxton either. Despite being served with the divorce papers two to three months prior to his arrest, Father never retained an attorney or participated in the divorce proceeding in any way. A permanent parenting plan was entered in the divorce proceeding on March 11, 2022. The parenting plan listed 365 days for Mother, and zero for Father, with the parties' incomes marked as "TBD" and the child support obligation left blank.

In February 2023, Father pled guilty to the two counts of leaving a child unattended in a motor vehicle. In doing so, he admitted to leaving the children unattended for two separate periods of 40 minutes and 65 minutes on the date of Brother's death. Father received a sentence of six months on each count. However, he was given pretrial jail credit to be applied to those sentences. After a trial, a jury found him not guilty on the charges of first-degree murder, aggravated child abuse/neglect/endangerment, reckless homicide, and child abuse/neglect/endangerment. During the criminal trial, Mother learned for the first time that Father had left the children alone in his vehicle while he went for a 40-minute eyebrow waxing and a 65-minute haircut. She also learned for the first time that Father had allegedly placed a phone call to another individual between his two salon visits and

stated at that time that one of the children was in distress.

After Father's release from incarceration on February 3, 2023, he immediately moved into the home of his current fiancée. He resumed working at the factory in March. Mother had the same telephone number and resided at the same address with Stepfather. However, Mother received no communication from Father regarding Braxton. Mother and Braxton encountered Father by chance on a couple of occasions while out in public, and Braxton did not know who he was. Father saw Braxton and made no attempt to speak to or interact with him.

After a couple of months without contact from Father, Mother decided to pursue child support from him due to the fact that the parenting plan left the child support section blank and Father had paid no support. Father was working and had purchased a $35,000 truck. The State of Tennessee filed a petition for child support on Mother's behalf on April 13, 2023. On June 5, 2023, four months after his release, Father filed a motion to modify the parenting plan and sought equal parenting time with Braxton.

On September 14, 2023, Mother and Stepfather filed a petition for termination of parental rights and adoption. As grounds for termination, they first asserted abandonment by failure to support, alleging that Father had not paid any child support during the four consecutive months preceding the filing of the petition, or, for that matter, since his release from incarceration in February. As a second ground, the petition asserted that Father had committed severe child abuse against Braxton and his deceased sibling, Brother. Specifically, the petition alleged that Father left the two boys unattended in his vehicle for over an hour, resulting in the death of Brother due to carbon monoxide poisoning and Braxton's exposure to carbon monoxide as well. Finally, Mother and Stepfather alleged that termination of Father's parental rights was in the best interest of Braxton.

The chancery court appointed a guardian ad litem for Braxton in October. The trial on the termination petition was held in March 2024. Braxton was four years old by the time of the termination trial and would be turning five in June. Aside from those chance encounters in public, he had not seen Father in over two years, since the day Father was arrested in February 2022.

Mother was the first to testify. She and Stepfather were married. Stepfather had two children, and she and Stepfather had recently had a child together. Thus, Braxton had two step-siblings and one half-sibling in the home. They had been living in the same home for two years. Mother testified that Braxton was a happy and healthy four-year-old and that he was flourishing. She testified that they keep Brother's memory alive but never speak of Father. Mother testified that Braxton had not spoken of Father and appeared to have no memory of him. Despite some initial redirection, Braxton had been calling Stepfather "Dad," as the other children in the home do. Mother testified that Stepfather had stepped into the role of a father for Braxton and "that's all Braxton knows him as."

She noted that Stepfather coached his sports team and took him to the doctor when he was sick.

In contrast, Mother testified that her four-year-marriage to Father had not been "a healthy environment." She testified to financial problems and "housing instability." She described "verbal" and "mental abuse" by Father. Mother admitted that the children witnessed the abuse and said that the situation was not healthy for her or for the children. She described how the parties eventually divided their time at home so that they were not around each other. Mother also testified about the day she informed Father that she was going to file for divorce. She said she picked the children up from daycare and took them to visit with Father that evening before his night shift because "he never really got to see them" due to his work schedule. She described the situation with the locked door and her decision to call law enforcement. Mother testified that there was no "altercation" that day other than her being unable to enter the house. She testified that she took the children to daycare the next morning and went to work as usual, then she was served with the order of protection prohibiting her from contacting Father or the children. Mother said she was not allowed to pick up the children from daycare. She testified that she stayed at a friend's house that night and never heard from Father the next day until he called her from the hospital.

Mother described arriving at the hospital and being told by doctors of Brother's death. She testified that she then traveled to Memphis to be with Braxton at the other hospital. She said that she and Father were there at different times, and when Braxton was released, he had to go with Father due to the order of protection. She testified that Father dismissed the order of protection the next day. Mother described the months after Brother's death as "a blur." She said that all she knew about what had happened that day was what Father had told her, but she had since learned that what he told her was not true. She acknowledged that the parties tried to reconcile and live together at her friend's house for about a month, but then they separated for good and she filed for divorce. Mother denied that Father was the "primary caregiver" for Braxton during this time. She noted that they initially agreed to a 50/50 alternating weekly schedule but admitted that the plan did eventually "fall off." She testified that she lived with her friend for a time, then with her grandmother, then moved in with Stepfather in January. Mother testified that Father often disregarded her requests to see Braxton when she was living with her grandmother, and he would not let her see Braxton from the time she moved in with Stepfather until Father was arrested. She said her attorney had advised her that it was not necessary to "go through all the hoops" of obtaining a temporary parenting plan because Father was likely to be arrested soon.

Mother testified that Father had not contacted her or sent financial support for Braxton since his release. She testified that she had the same telephone number and that Father knew where she and Stepfather lived because he had come to their house once before his arrest to bring her belongings. She said that Father had claimed both children on his

income tax return and got a refund, and she did not receive any of it for child support. Mother testified that she and Stepfather had solely provided financial support for Braxton for the past two years.

Mother testified that Braxton was now a "completely different child" than he was in the months after Brother's death. She described him as "a happier child." Mother testified that when Braxton first came to live with them, he was having night terrors and would wake up screaming and crying. She testified that those had not occurred in a long time. Mother testified that she did not believe it was in Braxton's best interest to reintroduce him to Father and feared that it would set him back emotionally and mentally. She said "he has no idea who [Father] is. And I'm just afraid of what that is going to do to Braxton." Mother noted that Father now lived with a new fiancée as well, and neither she nor Braxton knew Father's fiancée. Mother testified that Braxton had no relationship with anyone in Father's life. She also testified that she knew things now about the date of Brother's death that she did not know at the time, and those things scared her. Mother conceded that she was surprised and upset when Father was found not guilty on the remaining charges. She explained that she "wanted justice" for Brother and felt he "was failed." She acknowledged that the medical examiner indicated this was an accidental death. Still, Mother admitted she felt Father was "responsible for what happened to [Brother]." She explained that Father chose to leave the children unattended in his vehicle for as long as he did, "and that is what resulted in his death." She acknowledged that this guided her judgment as far as what contact she believed Braxton should have with Father and that she would be terrified if Braxton was with him due to what happened on the day Brother died. Mother emphasized that Father *never* told her that he had left the boys alone in his vehicle and that it was not until his criminal trial that she learned the boys were left unattended for periods of 40 and 65 minutes while Father went into salons. She was also unaware of the phone call to the dispatcher until the criminal trial. Now knowing all of these facts, Mother believed it was not in Braxton's best interest to be reintroduced to Father. She noted that Braxton was now the same age as Brother when he died, and she did not feel she would be able to trust Father with Braxton.

The next witness to testify was the dispatcher. She had been working as a 911 dispatcher for almost four years. She testified that she had "met" Father through Facebook a day or two before the date Brother died, but they had never met in person and only exchanged a few messages prior to that date. She said Father told her that he and Mother were separated, and they had discussed "hanging out at some point." The dispatcher testified that she had worked the night shift and that Father called her on August 21 around the time she got home from work. She said they talked as he got the boys ready to leave and throughout the duration of his drive to Jackson. She recalled that Father stopped in Medina and got the boys corn dogs at a gas station. The dispatcher testified that Father advised her that he was going into the salon and would call her back when he was done.

The dispatcher testified that Father called her back about 45 minutes to an hour later.

She testified that during this last phone call, "he was like, something's wrong, something's wrong." The dispatcher testified that she "could hear the little boy choking" over the phone. She said she asked what was wrong and suspected maybe he had choked on the corn dog. The dispatcher testified that she suggested that Father take the child out of his carseat and call 911. She said the call ended at that point, and she assumed that Father had called for help. The dispatcher testified that she subsequently fell asleep, having worked the night shift, and when she awoke that evening she saw a Snapchat message from Father stating that the child had died from carbon monoxide. She testified that she and Father had no ongoing relationship after their correspondence that day. The dispatcher was asked whether it was "obvious to you during that [final] phone call that [Father] recognized something was wrong with his child." She responded affirmatively. She said there was "no doubt in [her] mind that he knew something was wrong." When asked if she would be troubled to know that Father did not get the child out of the seat and get help, she replied, "Yes, I would be troubled to know that. Any parent would."

The dispatcher testified about giving her statement to police when they contacted her later that evening and meeting with three officers in person to give a recorded statement. Her recorded statements from that day were played via audio in court and transcribed in the record, and from the attorneys' descriptions, it appears that the recordings totaled about 20 minutes. A portion of her first statement was reproduced earlier in this opinion. During her recorded statements to police, the dispatcher reviewed the timestamp information on her phone and confirmed that her phone conversations with Father that day were at 8:51 for 51 minutes and at 10:24 for 8 minutes. She informed officers that Father told her during that final call that "the youngest one got sick" and "the oldest one started making, like, a weird noise, like something's wrong with him." She said Father kept trying to get the child's attention and yelling out his name, and she could hear strange breathing noises in the background like he was "trying to throw up" but getting choked. She told officers that Father said he had turned red. The dispatcher told officers she knew that one child had autism and did not know if that was related to him throwing up or why the boy was not responding when Father said his name. She told the officers that she did not know what Father did immediately after the 10:24 phone call, but he informed her that evening that the child had died from carbon monoxide and that the other one was being treated for it in Memphis. She said she had asked Father that evening if he had a carbon monoxide issue in his house, and he told her that he had an exhaust leak on his truck.

On cross-examination, counsel for Father questioned the dispatcher about some details of her testimony. The dispatcher had testified on direct that she told Father "you need to take him out of his car seat, and you need to call 911." Counsel for Father asked the dispatcher if her statements to police that day ever mentioned anything about her telling Father to get the child out of his seat and call 911. The dispatcher reviewed her statements and agreed that she did not specifically mention this in her statements, but she pointed out that she did tell police in her statements that she had asked Father if the child needed CPR. She testified that she was certain she also told Father during their phone conversation to

- 10 -

call 911, even if she failed to mention it during her statement to police that evening. She explained that she was nervous about being interviewed by several officers and concerned about the child's death, and she may not have talked about every detail.[3]

Next, counsel for Father asked the dispatcher about a portion of her statement to police that day where she said she had never met Father in person and then said, "Which I knew his wife, we're from the same county, so I knew -- . . . I knew her from high school, but I hadn't seen her since high school." The dispatcher explained during her testimony that she and mother are from the same county, but they did not actually attend the same high school, as the dispatcher went to a private school while Mother went to a public school. Thus, she explained that she had "heard [Mother's] name before" and "knew of

---

[3] During her second statement to police, the following exchange occurred:

INVESTIGATOR WILLIAMS: You're a 911 dispatcher –
[THE DISPATCHER]: I am.
INVESTIGATOR WILLIAMS: -- with the police, EMS, fire --
[THE DISPATCHER]: We do all of it.
INVESTIGATOR WILLIAMS: Did you think that he needed an ambulance?
[THE DISPATCHER]: I personally would've called the ambulance if that were me --
INVESTIGATOR WILLIAMS: Did you suggest it to him or --
[THE DISPATCHER]: No, I --
INVESTIGATOR WILLIAMS: Did you-all discuss it in any way? Okay.
[THE DISPATCHER]: When he --
INVESTIGATOR WILLIAMS: I'm not saying you did anything wrong. I'm just asking him. [sic] We weren't on the phone call.
[THE DISPATCHER]: Yeah. Whenever I could hear him, I was like, you know, is he clammy? Like, does he need you to start doing CPR? Did he get choked? And he was like, he's just really red. And then he kept trying to yell at him. And I was like, if he's not answering you. And he's like, let me call you back.
INVESTIGATOR WILLIAMS: Maybe -- if it was somebody --
[THE DISPATCHER]: Sorry.
INVESTIGATOR WILLIAMS: If he was choking.
UNIDENTIFIED SPEAKER: But once you got off the phone, it's like he was throwing up. And you believe he went to get a haircut, but you don't know where?
[THE DISPATCHER]: I don't know if he called somebody there. I don't know what he did.
INVESTIGATOR WILLIAMS: And the times that you were telling us, that's timestamps on your phone from where you talked with him?
[THE DISPATCHER]: Yes, sir.
INVESTIGATOR WILLIAMS: So I guess the last thing [Father] said -- I know you said you could hear him breathing funny and stuff like that. And [Father] said what? He said -
[THE DISPATCHER]: He said, "Let me figure out what's going on with him. I'll call you back."
INVESTIGATOR WILLIAMS: Got you.
[THE DISPATCHER]: Me personally, I probably would have, but it's not my kid and I was at work [sic], so I really can't tell you what to do.
INVESTIGATOR WILLIAMS: Right.

her" but actually "didn't know her." In conclusion, the dispatcher testified that she had no relationship with Mother that brought her there to testify in an effort to help her. She also stated that she never talked to Father at all after the day Brother died. Thus, she said, "I don't know either one of them, so I have no reason to lie about anything."

Father testified next. He was 25 years old at the time of trial. He began by testifying about his various jobs. During the parties' brief four-year marriage, prior to Brother's death, Father had concluded his service in the National Guard and worked at a series of four different jobs, as a pipe loader, welder, police officer, and in industrial maintenance. At the time Brother died, he had been working third shift in industrial maintenance, from Sunday night to Friday morning, 11:00 p.m. to 7:30 a.m., at a facility in another county with a 30 to 45-minute commute each way. After Brother's death, Father began working at a factory as a diesel mechanic. In the year since his release from incarceration, Father had initially resumed work at the factory, then went to a plumbing, heating, and air company, then started a new job in the month before trial.

Father testified that he and Mother lived at four different addresses during their four-year marriage. He also testified about moving to another home with Braxton after the parties separated. In addition, Father's answer to the termination petition admitted that Braxton had three more addresses since the parties separated, which appear to be the home of Mother's friend, the home of Mother's grandmother, and Mother's current home with Stepfather. Thus, by our count, Braxton, at age four, had already resided at eight different addresses. These addresses were in Jackson, Milan, Humboldt, and Henderson, Tennessee.

Father testified that he agreed with Mother's characterization of the marriage as "unhealthy." He testified that there was a lot of arguing and name-calling, but no physical abuse.[4] He said that the children witnessed their verbal altercations and that Mother sometimes went to her grandmother's house for weeks at a time. Father agreed that, by August 2021, Mother would go to work during the day while he was home sleeping, and

---

[4] Mother suggests in her brief on appeal that Father physically abused her during the marriage. However, Father testified there was no physical abuse. Mother's testimony at trial was unclear on this point. She testified:

| | |
|---|---|
| A. | It just was not a healthy environment. We had financial problems. There was verbal, mental abuse. It just overall was not healthy. |
| Q. | Okay. And when you say it was not healthy, was it not healthy for you, or was it not healthy for the children either? |
| A. | Both. |
| Q. | Okay. Did either of your children ever witness any verbal or physical abuse? |
| A. | Yes. |
| Q. | And who would that have been at the hands of? |
| A. | [Father]. |
| Q. | To who? |
| A. | Me. |

- 12 -

he would go to work at night while she was home sleeping. He admitted that on August 19 when Mother told him she was going to file for divorce, she left the children with him that evening to let him spend some time with them before he left for work. Father claimed that the issue about Mother being locked out was simply a misunderstanding because he had told Mother before that the door handle was "a little funny" and you had to pull on the door while trying to unlock it. He testified that he did not know Mother was locked out because he had on headphones. Father said that he and Mother did not talk once the sheriff's deputies arrived, he left for work while the officers were still there, and he and Mother did not communicate the remainder of that night. Thus, he admitted that he and Mother had not had a fight that evening. He testified that when he got home from work the next morning, she and the children had already left for work and daycare. Still, Father testified that he decided to get an order of protection against Mother. When asked what he needed protection from, Father testified, "All the previous times over the past seven years of us having verbal altercations and then an incident that happened when I was at [Jackson Police Department] where she ended up calling the cops on that, and then the verbal altercation and arguing and everything like that." He acknowledged that the order of protection also included Braxton and Brother. The following exchange occurred:

Q. I'm asking you today, what risk of harm did [Mother] pose to you on that day?
A. That day? None.
Q. None. What risk of harm did [Mother] pose to her two minor children on that day?
A. On that day? None.

Father testified that due to the order of protection, he picked up the children from daycare and stayed home with them that night. He acknowledged that Mother never saw Brother alive again.

The following day, again, is when Brother died. Father testified that he woke up somewhere around 9:00 a.m. and called his dispatcher friend. He acknowledged that telephone records show this call began at 8:21 a.m. Father testified that he remained on the phone the entire time as he left home and drove to Jackson with the children. He said he stopped at a gas station in Medina and left the two boys in the vehicle as he pumped gas and then went inside to buy them apple juice, a corn dog, and gummies. Father estimated he was in the store about ten minutes. He remained on the phone with the dispatcher as he returned to the truck and gave the children their snacks. He testified that Braxton was sitting in the seat behind him, and Brother was on the passenger side.

Father testified that the first stop he made in Jackson was at a salon to get an eyebrow wax. He said he had no reason to disagree with counsel's suggestion that he checked into the salon at 9:45 and checked out at 10:22. Thus, Father agreed that he remained in the first salon for 35 to 40 minutes while the children remained in the vehicle.

He testified that he returned to the vehicle after his eyebrow wax and drove through the parking lot to reach the second salon, where he planned to get a haircut. He was then asked about the 10:24 conversation with the dispatcher, and he testified as follows:

Q. At what point did you make the phone call to [the dispatcher]?
A. I don't remember making the phone call to [the dispatcher].
Q. Your testimony [to] this Court is that you do not recall calling [the dispatcher] when you went to the vehicle in between your eyebrow wax and your haircut?
A. Correct.
Q. You heard everything [the dispatcher] testified to this morning?
A. I did.
Q. Are you saying [the dispatcher] is being untruthful?
A. You can say that, yes.
Q. For -- about everything or about one thing, or about what?
A. Well, it depends on what you're asking me about. If you're asking me about that phone call, I don't recall that phone call conversation. I don't remember calling her.
Q. You don't remember calling her at all?
A. Not at that time. Don't remember calling that morning.
. . .
Q. Going back to that phone call to [the dispatcher], you do know – you've heard, and you've heard the interviews with her that those phone calls were timestamped, correct?
A. Correct.
Q. And you heard that there was a timestamped phone call between you and her at 10:24, and you know that lasted for eight minutes. You heard that, right?
A. Yes, ma'am.
Q. I guess what I'm asking, are you saying you don't remember that, or it didn't happen?
A. I don't remember there being a phone call at that time frame.
Q. Well, do you think that that phone call just happened at a different time?
A. I mean, I don't know. I'm just saying. You asked me that question. I -- I can't give you an answer. Only thing I can tell you is I don't recall having a conversation at that time.
Q. Okay. You -- do you agree with me that if you call someone at 10:24 and you talk to them for eight minutes, that brings you to 10:32, correct?
A. Yes, ma'am.
Q. And you know that there was video footage of you walking into Sports Clips for your haircut at 10:33?

- 14 -

A.    Yes, ma'am.
Q.    So that would indicate that if [the dispatcher] is telling the truth, that you, when you hung up the phone with her, you closed that door, you ignored the condition that she said your children were in and you went in to get a 65-minute haircut?
A.    They weren't in a condition at that time.
Q.    That's what I'm saying. But you are – you recognize if what she is saying is true, that's what happened that day?
A.    Yes, ma'am.

When asked if Brother was in some sort of distress when he returned to the vehicle between his salon visits, Father testified, "No, he was fine when I got to the vehicle." When asked if Braxton had "thrown up on himself," Father said, "No. He had a little bit of spit up before he had the gummies." Father clarified that he assumed Braxton's "spit up" was "from eating all the gummies." He was then asked if it was his testimony that the dispatcher's testimony regarding the condition of the children was "entirely false." He said, "As it relates to that time, yes." Father insisted that when he returned to the vehicle after his eyebrow wax, "they were both fine" aside from the spit up on Braxton's shirt.

Father testified that he then went into another salon for a haircut and that he was inside that establishment for 65 minutes while the children remained in the vehicle. He exited at 11:38. Father testified that when he got into the vehicle, he saw that "Braxton had spit up all over the front of him," so he decided to take them home. He said he assumed that the child may have had an upset stomach from the corn dog or too many gummies. Father testified that Brother said the word "cup" but did not take it when he held it out to him. However, Father explained that Brother was "non-verbal autistic" and could not really say a lot of words. Father testified that he pulled out onto the road and drove toward home for about half a mile, and he saw Brother "was just completely out of it," "staring up to oblivion" with "his head kind of tucked." He said he tried to shake him and could not get a response, so he called 911, pulled over, and tried CPR. He testified that an EMT arrived and discovered that Brother's chest was not rising and took out a long metal device and retrieved a piece of corn dog "that was blocking his airway where his chest wouldn't rise." He said they continued CPR and his chest began to rise, but Brother did not survive. He said both children were placed in ambulances and determined to have suffered from carbon monoxide poisoning. Father admitted that he was made aware that the truck had an exhaust leak when he purchased it three months earlier.

Father testified that he voluntarily dismissed the order of protection the following day. He testified that he and Mother attempted to reconcile while living at her friend's house, then he moved back into their old house for a few weeks, and finally, he moved into another house in Milan. Father admitted that he and Mother initially tried to be "cordial" and coparent, and they agreed to exercise time with Braxton "50/50" "[r]ight down the middle[.]" However, Father also admitted that he "exercised essentially primary control

- 15 -

over Braxton" during this time. He testified that he decided that Braxton "wasn't going to go to [Stepfather's] home" once Mother moved in there, so "she couldn't see him no more." When asked if there were times he "denied [Mother] access to Braxton," Father said, "Yeah, she – there was one point I denied her because she was staying with [Stepfather.]" Father admitted "that's when [he] decided that she would not be allowed to exercise this 50/50 arrangement with Braxton." Father estimated that he had Braxton close to ninety percent of the time during these months and took him to daycare while he worked, but he said he did sometimes let him go stay at Mother's grandmother's house when Mother was there.

Father testified that he never hired an attorney to represent him in the divorce proceeding, even though it was filed on November 5 and he was not arrested until February 28. He said the divorce was finalized while he was in jail, with a parenting plan giving him zero days and leaving child support undetermined. He testified that his bond was set at half a million dollars, and he did not have $50,000 to get a bondsman, so he remained incarcerated until his trial. Father testified that he pled guilty to two counts of leaving a child unattended in a motor vehicle and was found not guilty on the remaining charges. He explained that, in connection with his guilty plea, he admitted to leaving the two children, age two and four, unattended for periods of 40 and 65 minutes while he was inside the salons. Father testified that this was the first day he had ever left the children unattended in a vehicle, although he did so three separate times on the date of Brother's death. Father said, "I didn't think anything was going to happen. I had their favorite drinks, some snack[s], and a blanket in the back seat. AC was going, so it stayed nice and cool." Father testified that he did not have to serve any more time on the charges for which he pled guilty because he had already served enough time waiting for trial, so he was released.

Father testified that he did not see Braxton during the year he was incarcerated, and he had not seen him in person in the year since his release. He testified that he immediately went to the home of his current fiancée upon his release in February. He testified that he did not have a vehicle because his had been repossessed while he was incarcerated, so his father bought him a vehicle, but it kept having issues and quit working. He said his mother also bought him a phone. Father testified that he resumed working at the factory in March and purchased a 2017 F-150 for $35,000 in April, assuming a car payment of about $600 per month. Father testified that he also pays a share of the bills at his fiancée's home, including half the mortgage and other expenses. He had purchased an engagement ring for his fiancée as well. He admitted that he "resumed some sense of financial stability pretty quickly" and said he and his fiancée "both had a good income and everything." Still, Father admitted that he had not paid any financial support for Braxton, despite knowing Mother's address. He acknowledged receiving an income tax refund of $5,000 to $6,000 but testified that this sum went onto a card controlled by his father, and once he was released, he learned that this money had "basically disappear[ed]." Although Father had worked at three different jobs since his release, he admitted that he had consistently earned over twenty dollars per hour at his various jobs. Father testified that he had, "at some point," met with

- 16 -

a lawyer about the possibility of "trying to get something going" to see Braxton, but he did not have the money to hire him at that time. Father said he asked his father to contact Mother and to let her know he was home and wanted to see Braxton. Ultimately, however, Father said he believed there was nothing he could do to see Braxton unless he "got in front of a judge." He testified that after he was served with Mother's petition to set child support, he then went back to the attorney to have him "try to get something going" in response to that petition and also to start seeing Braxton again.

Father conceded that Braxton would need some sort of a transition period if he was reintroduced to him because, according to the testimony, "he doesn't know who I am." Still, Father believed he should be given the opportunity to "get back into his life." When asked what major hurdles he could envision, Father admitted that "I don't know how his life has been for the past two years. I don't know any of that." He acknowledged that he would need to regain communication and that "a lot of things changed" since he last saw him. He said "it'd kill me" if his parental rights were terminated. When asked if there was anything going on with him, emotionally or otherwise, "that says you can't step in and be the father you've always been to this boy," Father said no. He said he loved Braxton very much. His attorney then asked, "You heard comment made, there's concern about his physical safety if you get around him. Do you have any idea where that would be coming from or any idea of why you believe or there would be that belief out there, as far as your own self is concerned?" Father responded, "No, not that I know of." Father claimed he had "never done anything to physically harm Braxton in any way."

Finally, Father was questioned again by Mother's counsel about that final phone call with the dispatcher between the two salon visits. He testified:

> Q. [Father], I'm not going to go back over all this yet a third time, but what I am going to start with is that you are lying to this Court about that phone call to [the dispatcher], that third phone call,[5] are you not?
> A. No.
> Q. Did you or did you not make a third phone call to [the dispatcher] after you got your eyebrows waxed, but before you got your hair cut?
> A. There is phone records saying I did, but I don't recall having a conversation with her.
> Q. You don't recall, on the worst day of your life, calling a young lady and telling her that your young son had thrown up on himself and that your oldest son was unresponsive?
> A. No.
> Q. But you remember everything else about that day with crystal clarity. That's what you want this Court to believe?

---

[5] During the first call that morning, the call dropped and Father called the dispatcher back. So, the 10:42 phone call was sometimes referred to as the "third" phone call at trial.

A.  Well, you're entitled to believe it how you want. But I was the one that was there that day. And so whenever I noticed that my son was messed up in the backseat, and him staring off into oblivion, and that grasped my attention more than anything ever has in my entire life. So yes, at that moment right there, I kind of got a scarred memory of that.

Q.  So let me ask you this. Did you call anyone other than 911 after you got your hair cut?

A.  I don't remember if I called anybody other than 911 after I got my hair cut.

Q.  You told [your attorney] it was a relatively short drive. It wasn't very long after you got your hair cut, that you noticed the distress, correct?

A.  Correct.

Q.  So it makes sense that you didn't have an eight-minute phone conversation with [the dispatcher] after you got your hair cut, correct?

A.  Correct.

Q.  So you would have had that eight-minute phone conversation with her after you got your eyebrows waxed. I know you don't like it. I know it doesn't sound good, but that's the truth of what happened that day, is it not?

A.  If you say so, but I don't.

Next, Mother's counsel asked Father about what he told Mother (and others) about the date of Brother's death. He testified as follows:

Q.  Will you acknowledge for this Court that never one time, between the date of your son's death and the date of your incarceration, did you ever tell that woman that you had left her two small children in that vehicle unattended?

A.  Have I told her that?

Q.  Between that time period. After he passed and the day you got incarcerated, you never one time told her that you had left her two children in that vehicle unattended?

A.  I don't know if I did or didn't.

Q.  You didn't, did you?

A.  I don't -- I don't know.

Q.  You didn't tell any of your friends. You didn't tell your trooper buddies. You didn't tell your family. You didn't tell your mom. You didn't tell anyone what you had actually done that day, did you?

A.  No. Not -- not that I can recall. I didn't tell anybody a whole lot about the day.

When asked why he went to two separate salons, Father said for "personal preference."

The next witness to testify was Stepfather. He had met Mother toward the end of 2021. Stepfather acknowledged that Mother had good days and bad days and was not emotionally stable at that time due to the loss of Brother. He also noted that she had not "had her own place" since she and Father separated. Stepfather explained that Mother was living with her grandmother but they "weren't mentally healthy for each other," and he did not believe Mother was being given "a fair shot" to see Braxton despite her requests, so he asked Mother to move in with him "to get her in a better situation." Stepfather testified that he lived in a home with his two children and welcomed Mother (and eventually Braxton) into the home. He testified that they discussed getting custody of Braxton, so Mother went to talk to her divorce attorney about it, but he was "under the impression" Father was about to be arrested. He said Braxton came to live with them when Father was arrested on February 28.

Stepfather testified that he had been a "consistent figure" in Braxton's life ever since. He said that Braxton had heard other kids in the home "calling me dad" and started doing it too. Stepfather said that at first he redirected Braxton and reminded him of his first name, but eventually, Braxton "just did what the other kids were doing." Stepfather clarified, however, that he and Mother had never told Braxton that he is his "biological" father and that Braxton was too young to understand that. He described Braxton as a happy and healthy four-year-old and said he generally spends his time at home, preschool, playing baseball, or visiting relatives. Stepfather said his role was just to do whatever a father should do as a caregiver. He said he loved Braxton and that they had a healthy relationship. Stepfather had stable employment and owned their home. Stepfather and Mother had just recently had a fourth child, a half-sibling to Braxton.

Stepfather testified that he wanted to adopt Braxton and had committed himself to being his father figure, originally expecting that Father would be going to prison. Stepfather said that, once Father was released, he expected to receive some kind of contact from Father wanting to either see Braxton or talk to him because he knew that the no-contact order would have been lifted as soon as he was released. However, Stepfather testified that Father did not reach out. He said that after two months passed, he decided that Father "might not contact us" and that "we need to just get it over with" in light of the fact that the divorce papers left child support undetermined. Stepfather pointed out that Father did not seek parenting time until after he was served with the petition for child support.

Stepfather testified that he was very concerned about the possibility of Braxton being reintroduced to Father, as far as Braxton's "physical well-being." He said that Braxton had night terrors for some time. Stepfather had never heard Braxton speak of Father and said he had no knowledge to suggest he even remembered him. He also was concerned about Mother and Father's ability to coparent and the impact that doing so would have on their family. Stepfather testified that he knew what it takes to coparent and that

- 19 -

he had never witnessed Mother and Father being able to get along. He testified that there was one occasion before Father was arrested when Father "had a date or something" and was going to allow Braxton to come to his home to stay with Mother, but then they got into an argument and "cussing match" and Father called her names and made her cry, "all because something didn't go his way." Thus, he noted that coparenting would have an impact on Mother, him, and the children, and it would also depend on how Braxton reacted to the reintroduction.

Father presented the testimony of several additional witnesses, who were friends, coworkers, and relatives, although we deem the value of their testimony as somewhat limited due to their lack of knowledge of what occurred on the day Brother died. For instance, the first witness had been Father's neighbor "for a short time" around 2019 and was a coworker. When asked how many times he had the opportunity to observe Father with both of his children since then, he responded, "It was more or less, I may have seen him a handful of times, you know, physically in person. Outside of that, phone call." When asked if he knew what happened on the date of Brother's death, the witness responded that Father gave him "a very vague description" of what happened but never told him how long the children had been left alone. The next witness was another coworker, who testified that he was "pretty good friends" with Father and went to "hang out" at the parties' home during the marriage. This witness testified that he had no concerns about the children being at risk of danger with Father. However, he admitted that he did not know what happened on the day of Brother's death. When asked if he would expect Father to leave his children unattended for 65 minutes, the witness admitted that he would not have expected Father to do that and would not have expected him to have "that type of lapse in judgment."

Another witness testified that he and Father are "really great friend[s]." He hunted, fished, and worked on vehicles with Father, and he also visited the parties' home. This witness testified that it was "pretty standard" for Mother and Father to be having relationship problems, as one day they were fine and the next they were not. The witness testified that anytime Father was in his presence he was "a great father." He had ridden in Father's Dodge Ram a few times and said it was so loud "[y]ou could hear it coming from a mile away." He believed it "either didn't have an exhaust on it or it just – it had an exhaust on there that was just very loud." He noted that it "was loud outside and inside the cab." The witness initially said he never had any concerns to make him think the vehicle was unsafe. However, he later admitted that "[a] vehicle that doesn't have a functioning exhaust system is unsafe." The witness also admitted that he would never have "left those two children in that vehicle unattended for over one hour." This witness had visited Father after Brother's death when Braxton was there. He said Braxton "wasn't old enough to understand, but he definitely knew that his brother wasn't there no more. . . It was just more along the lines, just quiet, and he just had this look to his eyes that – that he knew something was missing – just not quite old enough to grasp it." He said Braxton "didn't like [Father] getting out of an eyesight from him."

- 20 -

Finally, the court heard testimony from Father's mother. She said she had kept Brother frequently when he was young but did not spend as much time with the children once Braxton came along. She accused Mother of driving a wedge between her and Father from that point forward and acknowledged that there was a period of time when she and Father did not speak. Still, she testified that, to her knowledge, there were periods during the marriage when Mother would leave the home due to the marital problems, and Father would be responsible for the children. Father's mother testified that she had no concern about Father posing a risk of harm to the children, even knowing the circumstances surrounding Brother's death. She admitted, however, that she and Father were not on speaking terms during the timeframe leading up to Brother's death. In fact, she learned about Brother's death not from Father but from Facebook. Father's mother also admitted that she had not called Mother since Father went to jail in an effort to see Braxton, so she had not seen Braxton in the past two years. She admitted that she never sent him any card, letter, or anything else, and Father had not asked her to do so either.

At the conclusion of the termination trial, the trial judge took the matter under advisement. On April 26, 2024, the trial court entered an order denying the petition to terminate Father's parental rights. First, the trial court addressed the ground of abandonment by failure to support. The trial court found that Father did not plead lack of willfulness as an affirmative defense to the claim of abandonment, Mother and Stepfather objected to the court considering such a defense at the hearing, and the trial court "sustains such objection." Next, the trial court noted that the termination petition was filed on September 14, 2023, and the court calculated the relevant four-month period for analyzing this ground as running from May 1 to September 1, 2023. The trial court found that Father was released from incarceration after his trial on February 2, 2023, and that he "did not attempt to visit the Child nor did he attempt to pay any child support to [Mother] prior to the State of Tennessee filing a Petition to Set Child Support against him on April 13, 2023." The trial court noted that Father filed a petition to modify the parenting plan on June 5 and requested equal parenting time. It noted that the existing parenting plan provided for zero days with Father and left the child support obligation to be determined. The trial court found that Father "appropriately and accurately followed the Permanent Parenting Plan that was in place" upon his release, "such that [his] child support obligation had not been set at the time he was released from incarceration." "Therefore," the court continued, "Petitioners have failed to prove that [Father] abandoned Child during the relevant time period, as [Father] was operating pursuant to a valid court order that superseded [his] statutory obligation to support the Child." The order continued:

> The Court finds that [Father] did not abandon the Child as defined in the statute as [Father] was operating pursuant to the terms of a valid court order for visitation and child support after he was released from incarceration, and that order did not provide him with any visitation days with Child nor with a required child support payment amount. The Court finds that this valid, written court order superseded [Father]'s statutory obligation to support

- 21 -

Child during the relevant time period, and the Court further finds that any issues with regard to back child support can be rectified through an order for the payment of money that can be sought and determined at a later date. In essence, the Court finds that [Father] did not intentionally or negligently abandon Child during the relevant time period as required to terminate his parental rights pursuant to statute.

Accordingly, the court found that this ground was not sufficiently proven.

Next, the trial court analyzed the ground of severe child abuse. It made the following findings:

16.   Aside from the incident which occurred on August 21, 2021, which resulted in the death of [Father]'s and Mother's child, [Brother], there was no evidence presented at the hearing that [Father] is a danger to Child. [Father] was appropriately remorseful for the incident having occurred and took responsibility for his criminal actions on that date by pleading guilty to two counts of Leaving a Child Unattended in a Car. The Court specifically finds that neither [Father] nor Mother had knowledge of or any reason to know that the truck in which [Father] left the two children unattended on August 21, 2021 had a carbon monoxide leak which might result in severe bodily harm to the children.
17.   Although there was some conflict in the testimony with regard to the timeline of exactly what happened on August 21, 2021, the Court finds that [Father] acted appropriately once he realized that something was wrong with his children and that he did not do anything to knowingly or intentionally cause any harm to his children on that date.
. . .
20. The Court finds that [Father] did not commit "severe child abuse" as defined by statute on August 21, 2021, nor at any other time with regard to the Child at issue in this case.
. . .
. . . [T]he Court finds that although the circumstances of August 21, 2021 are certainly tragic, those circumstances do not rise to the level of "severe child abuse" as defined by the statute and as required to terminate a parent's parental rights to a child. The evidence presented at the hearing showed that prior to his arrest, [Father] was a good father and provided a good home for Child, despite [Father] and Mother's marital difficulties. [Father] was remorseful and the Court is convinced that the circumstances of August 21, 2021 will not be repeated. The Court agrees with the sentiments expressed by Mother in her Facebook post entered into evidence as Exhibit 4 at the hearing, and the Court believes those sentiments were accurate then and are still accurate, despite the hurt that the circumstances of August 21, 2021 have

caused to the parties in this case and to others.

Even though the trial court had concluded that no grounds for termination existed, it went on to address the statutory best interest factors and found, for reasons that will be discussed in more detail below, that it was not in the best interest of Braxton for Father's parental rights to be terminated. Mother and Stepfather timely filed a notice of appeal to this Court.

## II.  ISSUES PRESENTED

Mother and Stepfather present the following issues for review on appeal:

1.      Whether there was clear and convincing evidence to support the ground of abandonment.
2.      Whether there was clear and convincing evidence to support the ground of severe abuse.
3.      Whether there was clear and convincing evidence that termination of Father's parental rights was in the best interests of the child.

The guardian ad litem has filed a brief on appeal reflecting his agreement with the trial court's conclusions that no ground for termination of parental rights was proven and that termination was not in the best interest of the child.[6]

For the following reasons, we reverse the decision of the chancery court and remand for entry of an order terminating Father's parental rights.

## III.  STANDARDS APPLICABLE TO TERMINATION PROCEEDINGS

"In Tennessee, proceedings to terminate parental rights are governed by statute." *In re Markus E.*, 671 S.W.3d 437, 456 (Tenn. 2023) (citing *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015)).  Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546.  Pursuant to the statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552.  First, that party must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.*  The grounds are "cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within

---

[6] Before the trial court, the guardian ad litem took the position that one ground for termination – failure to support -- had been proven by clear and convincing evidence. Curiously, his brief states that he no longer takes that position because he was initially appointed as guardian ad litem in the post-divorce support and custody matter between the parties, "there was never an actual hearing" in that matter before the termination petition was filed, and yet "it appears that there was ample opportunity for the trial court to assess the testimony of any witnesses prior to the Guardian ad Litem's appointment on the father's attempt to set a visitation schedule in 2023."

another ground." Tenn. Code Ann. § 36-1-113(g). Second, the petitioner must prove that termination of parental rights is in the best interest of the child, considering the best interest factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Kaliyah S.*, 455 S.W.3d at 552.

Because of the constitutional dimension of the parent's rights at stake, the party seeking termination "must prove all the elements of their case by clear and convincing evidence." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). To be clear and convincing, the evidence must enable the finder of fact "to form a firm belief or conviction regarding the truth of the facts" sought to be established and eliminate "any serious or substantial doubt about the correctness" of the findings. *Id.* Due to this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Appellate courts review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

### IV. DISCUSSION

#### A. Grounds for Termination

#### 1. Abandonment by Failure to Support

Tennessee Code Annotated section 36-1-113(g)(1) provides that one ground for termination of parental rights exists if "[a]bandonment" has occurred within the meaning of Tennessee Code Annotated section 36-1-102. Here, Mother and Stepfather alleged abandonment under the following definition:

> If the child is four (4) years of age or more, for a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or amended or supplemental petition to terminate the parental rights of the parent or parents [] of the child who is the subject of the petition for termination of parental rights or adoption, the parent or parents [] either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

- 24 -

Tenn. Code Ann. § 36-1-102(1)(A)(i)(a).[7] For purposes of this section, "'failed to support' or 'failed to make reasonable payments toward such child's support' means the failure, for the applicable time period, to provide monetary support or the failure to provide more than token payments toward the support of the child." *Id.* at 36-1-102(1)(D). "That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant time period." *Id.* "Our statutes provide that '[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children.'" *In re Bentley E.*, 703 S.W.3d 298, 303 (Tenn. 2024) (quoting Tenn. Code Ann. § 36-1-102(1)(H) (Supp. 2022)). Moreover, "the law is clear that parents have a duty to support their children even absent a court order requiring them to do so." *In re Makenzie L.*, No. M2014-01081-COA-R3-PT, 2015 WL 3793788, at *20 (Tenn. Ct. App. June 17, 2015) *perm. app. denied* (Tenn. Oct. 15, 2015) (citing *State v. Wilson*, 132 S.W.3d 340, 343 (Tenn. 2004)). "It is well settled in Tennessee that a parent maintains an obligation to provide child support and is taxed with knowledge of that obligation even in the absence of a court order or request from the other parent." *In re Zaidyn B.*, No. M2023-01095-COA-R3-PT, 2024 WL 4311301, at *6 (Tenn. Ct. App. Sept. 27, 2024) *perm. app. denied* (Tenn. Dec. 17, 2024).

Under the statute, "it shall be a defense to abandonment for [] failure to support that a parent or guardian's failure to [] support was not willful." Tenn. Code Ann. § 36-1-102(1)(I). "Failure to support is willful when a parent is aware of the duty to support and has the ability but makes no attempt to provide support and has *no justifiable excuse* for failure to do so." *In re Mattie L.*, 618 S.W.3d 335, 345 (Tenn. 2021) (emphasis added). However, "[t]he absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure." Tenn. Code Ann. § 36-1-102(1)(I). The trial court correctly found that Father did not raise the absence of willfulness as an affirmative defense and that Mother and Stepfather objected to the issue being raised at trial. As such, Father waived his right to assert a lack of willfulness. *See In re Layton S.*, No. W2024-00973-COA-R3-PT, 2025 WL 1088253, at *8 (Tenn. Ct. App. Apr. 11, 2025); *In re Allie-Mae K.*, No. M2020-00215-COA-R3-PT, 2020 WL 6887870, at *9 (Tenn. Ct. App. Nov. 24, 2020).

Despite this recognition, the trial court went on to find that Father acted "appropriately" by following the parenting plan, which did not provide him with any days or a required amount of child support. "In essence," the court said, it found that Father did not "intentionally" abandon the child, as he was "operating pursuant to a valid court order." However, it appears that the trial court was essentially addressing the issue of whether Father's actions were willful in light of the existing court order or if he had a justifiable excuse.[8] For instance, in *In re Connor A.*, No. M2024-01236-COA-R3-PT, 2025 WL

---

[7] Throughout this opinion, we utilize the versions of the statutes in effect when the petition was filed in 2023.

[8] In *In re Abraham S.*, No. M2022-00690-COA-R3PT, 2023 WL 3494966, at *6 (Tenn. Ct. App.

432865, at *6 (Tenn. Ct. App. Feb. 7, 2025), a mother argued with respect to the ground of abandonment by failure to visit that she was prohibited from visiting due to the existence of a court order. We explained, "Although not stated as such, Mother's argument raises the question of whether her lack of visitation was willful." *Id.*

The trial court's reasoning likewise implicates the issue of willfulness. *See, e.g.*, *In re Bentley E.*, 703 S.W.3d 298, 303 (Tenn. 2024) ("Although Father had filed a petition to establish visitation and child support, his obligation did not stop during the interim. Therefore, Father has not proven that his failure to pay support was not willful."); *In re Miriam T.*, No. W2024-01752-COA-R3-PT, 2025 WL 2591395, at *12 (Tenn. Ct. App. Sept. 8, 2025) (concluding that a mother's failure to pay support was not willful where there was an order in place setting her support obligation but she understood it to mean that no support was owed in light of her responsibility to pay for supervised visitation); *In re ChiVon G.*, No. E2018-02012-COA-R3-PT, 2019 WL 4127631, at *6 (Tenn. Ct. App. Aug. 30, 2019) ("Mother's failure to pay support due to the lack of a court order directing her to do so [] can only be characterized as 'intentional or voluntary' as opposed to 'accidental or inadvertent.' We find Mother's argument that her failure to pay child support was not willful due to the absence of a court order concerning support to be unavailing.") (citation omitted); *In re Makenzie L.*, No. M2014-01081-COA-R3-PT, 2015 WL 3793788, at *20 (Tenn. Ct. App. June 17, 2015) ("[W]e do not find the absence of a child support order or the parents' minimal cooperation with the Child Support Division of the District Attorney to be a justifiable excuse for their not providing support to Makenzie. Therefore, we hold that the evidence in this case clearly and convincingly supports a finding that the parents willfully abandoned Makenzie within the meaning of Tenn. Code Ann. § 36-1-102(1)(A)(i) by willfully failing to support [] Makenzie."); *In re Brookelyn W.*, No. W2014-00850-COA-R3-PT, 2015 WL 1383755, at *11 (Tenn. Ct. App. Mar. 24, 2015) ("the fact that the Tipton County Juvenile Court order did not specifically address support is not an excuse for Father's failure to support his child"); *In re Kiara C.*, No. E2013-02066-COA-R3PT, 2014 WL 2993845, at *8 (Tenn. Ct. App. June 30, 2014) (rejecting a father's argument that his failure to support was not willful where it was "grounded in a misreading of the divorce decree, in which the Illinois court *reserved* rather than waived the issue of child support," and in any event, "whether Father had ever been ordered by a court to pay child support or advised of his duty to do so is irrelevant" because "parents are presumed to know that they have a duty to support their children").

Here, Father waived the issue of willfulness. Because it is undisputed that Father failed to provide *any* support for Braxton during the four months preceding the filing of the termination petition, we conclude that this ground for termination was proven by clear

May 17, 2023), a father argued that *the petitioner* "failed to prove by clear and convincing evidence that [his] failure to support the Child was willful or that he did not have a justifiable excuse for failing to provide support." *Id.* at *6. We explained that "Father misstates the law." *Id.* "[T]he burden fell to Father to assert, as an affirmative defense, that his failure to support was not willful, and to prove same by a preponderance of the evidence." *Id.* (citing Tenn. Code Ann. § 36-1-102(1)(I)).

and convincing evidence.[9]

## 2.    Severe Child Abuse

The next ground for termination asserted by Mother and Stepfather was severe child abuse.   When the termination petition was filed in 2023, the statute provided that this ground for termination existed when:

The parent [] has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child.

Tenn. Code Ann. § 36-1-113(g)(4).   Pertinent to this appeal, the following definition of severe child abuse was in effect at the time when the termination petition was filed:

(27) "Severe child abuse" means:
(A)(i) The *knowing* exposure of a child to or the *knowing* failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the *knowing* use of force on a child that is likely to cause serious bodily injury or death[.]

Tenn. Code Ann. § 37-1-102(b)(27) (emphasis added).

Surprisingly, the trial court made very limited findings regarding the ground of severe child abuse and what occurred on the date of Brother's death.   The order stated:

The Court specifically finds that neither [Father] nor Mother had knowledge of or any reason to know that the truck in which [Father] left the two children unattended on August 21, 2021 had a carbon monoxide leak which might result in severe bodily harm to the children.
17.   Although there was some conflict in the testimony with regard to the timeline of exactly what happened on August 21, 2021, the Court finds that [Father] acted appropriately once he realized that something was wrong with his children and that he did not do anything to knowingly or intentionally cause any harm to his children on that date.

---

[9] To the extent that the trial court further found that "any issues with regard to back child support can be rectified through an order for the payment of money that can be sought and determined at a later date," we note "[t]he statute is clear that '[a]bandonment may not be repented of by resuming ... support subsequent to the filing' of a termination petition."  *In re Mia C.*, No. E2023-00828-COA-R3-PT, 2024 WL 4003297, at *18 (Tenn. Ct. App. Aug. 30, 2024) (quoting Tenn. Code Ann. § 36-1-102(1)(F)).
We also note that the trial court utilized the wrong four-month period, but the miscalculation by a few days does not matter here because Father paid no child support payments at all.

. . .

20.  The Court finds that Respondent did not commit "severe child abuse" as defined by statute on August 21, 2021, nor at any other time with regard to the Child at issue in this case.

. . .

[T]he Court finds that although the circumstances of August 21, 2021 are certainly tragic, those circumstances do not rise to the level of "severe child abuse" as defined by the statute and as required to terminate a parent's parental rights to a child.

Because of the "knowing" requirement in the definition of severe child abuse, we must begin by examining what Father knew and when he knew it.  This analysis necessarily requires us to examine the testimony of the dispatcher regarding what Father allegedly told her when he returned to the truck between his two salon visits.  Notably, the trial court's discussion of the dispatcher's testimony was remarkably limited.  When listing the witnesses at trial, the trial court noted that it heard testimony from "a 911 dispatcher and person whom [Father] spoke with by phone and electronic message on the date the parties' other child passed away." The trial court then noted, in the quoted sentence above, that "[a]lthough there was some conflict in the testimony with regard to the timeline of exactly what happened on August 21, 2021, the Court finds that [Father] acted appropriately once he realized that something was wrong with his children[.]"  We believe a more in-depth discussion is necessary to determine how the dispatcher's testimony impacts the issues on appeal.

The trial court did not expressly state that it found the testimony of the dispatcher not to be credible.  However, this seems to be the most likely scenario.  It is hard to imagine how the trial court could have found that Father "acted appropriately once he realized that something was wrong" while *accepting* the dispatcher's testimony that the children were in distress before Father entered the second salon.  Therefore, we will treat the trial court's finding in this regard as an implicit credibility finding against the dispatcher and review it as such.  "[W]e are required to defer to the trial court's credibility findings, including those that are implicit in its holdings." *Williams v. City of Burns*, 465 S.W.3d 96, 120 (Tenn. 2015).  "When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary." *In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023).

It is undisputed that Father spoke to the dispatcher that day, and the trial court recognized that he did.  Timestamped phone records confirm their telephone calls, and Father himself informed the police that evening that he had spoken with the dispatcher earlier in the day.  Police officers then contacted the dispatcher and asked about her conversations with Father.  The dispatcher's first recorded statement bears repeating:

INVESTIGATOR WILLIAMS: This is Investigator Williams.

[THE DISPATCHER]: Hi, this is [xxxx].

INVESTIGATOR WILLIAMS: Hey, [] how are you?

[THE DISPATCHER]: I'm good. How are you?

INVESTIGATOR WILLIAMS: Good, good. Sorry to bother you.

[THE DISPATCHER]: You're fine.

INVESTIGATOR WILLIAMS: Well, you know, we was just trying to talk to you briefly. So our understanding, did you talk to [Father], I guess, earlier today or this morning sometime?

[THE DISPATCHER]: I did.

INVESTIGATOR WILLIAMS: Got you. Are you aware that I guess we're kind of working a situation?

[THE DISPATCHER]: Yes.

INVESTIGATOR WILLIAMS: Okay. What we was calling you for, we was just curious about what time did you talk to him? Do you know?

[THE DISPATCHER]: It would be between 7:00 and – but I can tell you.

INVESTIGATOR WILLIAMS: Okay.

[THE DISPATCHER]: Just a second. It was about around 10:30-ish.

INVESTIGATOR WILLIAMS: About 10:30?

[THE DISPATCHER]: Yes. He called me after he left Sports Clips, I believe.

INVESTIGATOR WILLIAMS: Okay.

[THE DISPATCHER]: Was it Sports Clips? Somewhere to get his eyebrows waxed.

INVESTIGATOR WILLIAMS: Got you, got you. Do -- and I know you probably don't remember exactly everything that you-all talked about or anything like that, but did he say anything in particular or anything? Do you --

[THE DISPATCHER]: He said that his youngest one had threw up on his self and that his oldest one started, like, breathing really funny. And he said that he was, like, blood red, almost like he was trying to throw up.

INVESTIGATOR WILLIAMS: And this was --

[THE DISPATCHER]: And --

INVESTIGATOR WILLIAMS: And you said this was after he got his eyebrows done?

[THE DISPATCHER]: Yes.

INVESTIGATOR WILLIAMS: Got you.

[THE DISPATCHER]: And then he kept trying to get his attention and he wouldn't respond. He just kept making like this, like gasping, like breathing noise. And he said he was really red. And then he told me he would call me back. And that was about the gist of the conversation because he said his youngest one had already threw up.

INVESTIGATOR WILLIAMS: Right. Can you – can you look in your phone and give me the time? I know you said it was about 10:30.

- 29 -

[THE DISPATCHER]: I can. Hold on one second. 10:24.

INVESTIGATOR WILLIAMS: 10:24 was when he called you?

[THE DISPATCHER]: Yes.

INVESTIGATOR WILLIAMS: And he said that – said he just got his eyebrows done. And said one of them had thrown up and the other one was not looking good?

[THE DISPATCHER]: The littlest one had already threw up and they was in the truck. And the oldest one, like I said, started making, like, this breathing noise, like he was trying to breathe. And he said he was really, really red. And he kept saying he didn't know what was going on. And he kept trying to get his attention --

INVESTIGATOR WILLIAMS: While you was on the phone with him?

[THE DISPATCHER]: And he wouldn't ever --

INVESTIGATOR WILLIAMS: Got you. How long – how long – what's the duration on you-all's call there? How long did you all talk on the phone with him?

[THE DISPATCHER]: Let me see if I can tell you. It was on Facebook Messenger, so I don't know if it will tell me an exact -- let me see.

INVESTIGATOR WILLIAMS: I know on that -- on that message --

[THE DISPATCHER]: Eight minutes.

INVESTIGATOR WILLIAMS: You said eight minutes?

[THE DISPATCHER]: Yes, sir.

INVESTIGATOR WILLIAMS: Got you. I was going to say you could probably hit that little – that little blue eye or whatever it is over there on the -- on the right side there. Okay. And –

[THE DISPATCHER]: And I had talked to him previous that morning when they were on their way to Jackson and both of the kids were fine.

INVESTIGATOR WILLIAMS: Got you. Got you.

[THE DISPATCHER]: He left the house, and he stopped somewhere in Medina I believe to get gas, and he got both the kids something to eat and they was going to Jackson to get his hair cut and his eyebrows waxed, and then they was going to go eat lunch.

INVESTIGATOR WILLIAMS: And you was talking to him when he was doing that, when he was in Medina and stuff?

[THE DISPATCHER]: Yes. And then he called me. He told me he would call me when he got done getting his eyebrows waxed. And then that was when he called me back at 10:24.

INVESTIGATOR WILLIAMS: Got you. And he was saying that something was wrong with the kids?

[THE DISPATCHER]: Yes.

INVESTIGATOR WILLIAMS: Got you. What time was the first call that you had with him when he was going through Medina and all that? Do you --

[THE DISPATCHER]: The first call was at 8:51.

INVESTIGATOR WILLIAMS: And how long was that?

[THE DISPATCHER]: 51 minutes.

INVESTIGATOR WILLIAMS: 51 minutes?

[THE DISPATCHER]: Uh-huh.

INVESTIGATOR WILLIAMS: Got you. Got you. Okay. Well, we -- you know, we had -- obviously we had talked to him today and stuff and he said that he had talked to you, and he had talked to you for a while, you know, while he was getting his hair cut and all that stuff done. So we hadn't had a chance to talk to you today, so we was just trying to backtrack, you know. We was curious, you know, if he had said anything to you about the kids or anything like that, or –

[THE DISPATCHER]: Well, like I said, they were fine this morning and they got up and got ready and went to Jackson. And then he called me when they -- when he was fixing to leave from getting his eyebrows waxed. And he had said that the oldest one started acting really funny and started turning, like, red. And like I said, you could hear -- I could hear him making, like, really weird, like, breathing noises.

INVESTIGATOR WILLIAMS: Got you. Got you. Had you ever met his kids before?

[THE DISPATCHER]: No, I have not.

INVESTIGATOR WILLIAMS: I got you. And if you don't mind me, are you -- are you and him dating now or are you all just friends or --

[THE DISPATCHER]: No, we're just friends.

INVESTIGATOR WILLIAMS: Got you. Got you. How long have you known [Father]?

[THE DISPATCHER]: Like three days.

INVESTIGATOR WILLIAMS: Ah, okay. I got you.

[THE DISPATCHER]: Yeah.

INVESTIGATOR WILLIAMS: 10:30. Okay. But – and I'm just confirming with you, at 10:24 or 10:30 when he called you, that was when the kids were having problems?

[THE DISPATCHER]: Yes.

INVESTIGATOR WILLIAMS: Got you. And did you say that he was going to get a haircut after that?

[THE DISPATCHER]: Yes.

INVESTIGATOR WILLIAMS: Okay. Did -- and you said he never called you back again, right?

[THE DISPATCHER]: No.

INVESTIGATOR WILLIAMS: Got you. How did you find out about all of this? At what time did he ever finally call you back today, or --

[THE DISPATCHER]: He never called me back. I had – I work midnights at the Sheriff's Department . . . .

INVESTIGATOR WILLIAMS: Got you.

[THE DISPATCHER]: And I didn't get off until 7:00 this morning. So whenever he said he would call me back, I fell asleep, and I had texted him on Snapchat and asked him if he was okay, and then I fell asleep and didn't wake up until almost 8:00. And at some point, he messaged me back and that's when he told me that he had passed away due to carbon monoxide.

INVESTIGATOR WILLIAMS: Got you. Got you. And you said that was at like 8:00 something tonight?

[THE DISPATCHER]: Yeah, I didn't wake up until almost 8:00. He texted me at some point throughout the day, but I don't know if the Snapchat was opened, and it goes away.

INVESTIGATOR WILLIAMS: Got you.

[THE DISPATCHER]: At some point throughout the day, he had said -- told me what happened, and I didn't open it until I woke up --

INVESTIGATOR WILLIAMS: Right.

[THE DISPATCHER]: -- tonight.

INVESTIGATOR WILLIAMS: Right. And have you talked to him tonight?

[THE DISPATCHER]: Yes. I talked to him earlier. He said that they're in Memphis.

INVESTIGATOR WILLIAMS: Okay. Got you. Are you -- are you working now by chance?

[THE DISPATCHER]: No, no, no. I don't go back until tomorrow night.

INVESTIGATOR WILLIAMS: Okay. Are you -- are you somewhere where we can meet up with you? We can come to you wherever you are, if that's okay, and just get like a brief statement from you right quick?

The details the dispatcher provided in this statement are corroborated by the remainder of the proof presented at trial. She knew everything from the place where they stopped for gas and snacks that morning to the name of the salon where Father went and the location where Braxton was being treated that evening. We also find it significant that the timestamp of her telephone call with Father perfectly lines up with the times when he exited and entered the salons. Father admits that he checked out of the first salon at 10:22 and that there is video footage of him entering the second salon at 10:33. According to the dispatcher, the timestamp of her second phone call shows that it began at 10:24 and lasted eight minutes, which means it ended at 10:32. However, the dispatcher would not have known the exact times when Father entered and exited the salons when she spoke to police that day and provided this information.

On the other hand, Father's explanation about the phone call was not convincing. After being confronted with the timestamp information, Father was asked "[d]id you or did you not" make that phone call. He responded, "There is phone records saying I did, but I don't recall having a conversation with her." Still, Father continued to insist that the conversation did not occur:

Q. So you would have had that eight-minute phone conversation with her after you got your eyebrows waxed. I know you don't like it. I know it doesn't sound good, but that's the truth of what happened that day, is it not?

A. If you say so, but I don't.

Father also suggested that the dispatcher's testimony about the content of that particular phone call was untruthful because the children were "fine" when he returned to the truck, aside from the "spit up" on Braxton's shirt. So, when asked if the dispatcher's testimony was "entirely false," Father said, "As it relates to that time, yes." Father did not suggest why the dispatcher would have made up such a story and provided it to law enforcement just hours after the incident occurred. The dispatcher's subsequent recorded statement was entirely consistent with her first and provided additional details. Those are also consistent with her trial testimony. The dispatcher testified at trial that she did not talk to Father again after the date of Brother's death, she had no relationship with Mother, and she had no reason to lie about anything. Father, on the other hand, has every reason to lie about the content of that conversation. As Father acknowledged at trial:

Q. Okay. You -- do you agree with me that if you call someone at 10:24 and you talk to them for eight minutes, that brings you to 10:32, correct?

A. Yes, ma'am.

Q. And you know that there was video footage of you walking into Sports Clips for your haircut at 10:33?

A. Yes, ma'am.

Q. So that would indicate that if [the dispatcher] is telling the truth, that you, when you hung up the phone with her, you closed that door, you ignored the condition that she said your children were in and you went in to get a 65-minute haircut?

A. They weren't in a condition at that time.

Q. That's what I'm saying. But you are – you recognize if what she is saying is true, that's what happened that day?

A. Yes, ma'am.

We also note that Father has already demonstrated his willingness to lie about what happened that day by telling Mother a story that was untruthful and failing to even tell her that he had left the children alone in the vehicle. Moreover, Father has no other explanation for what he and the dispatcher would have discussed during the 10:24 conversation because he simply denies that the conversation occurred. Given the existence of timestamped phone records disputing Father's testimony, we conclude that the clear weight of the evidence, which is clear and convincing, shows that Father *did* have the conversation with the dispatcher between 10:24 and 10:32.

We now examine the content of the dispatcher's testimony. Her second recorded statement to police, which was more lengthy, was also played as audio at the termination trial. She told the officers that Father told her during that 10:24 phone call that the youngest child had "got sick" and the other was "breathing funny," and at first Father thought "maybe it was the corn dog." She told officers that Brother started making a weird noise like something was wrong, and Father said "he was acting like he had to throw up." The dispatcher said that Father "kept yelling out his name" and trying to get his attention, and she could hear him breathing in the background "like trying to throw up." She explained, "It was almost like he was trying to throw up and he was getting, like, choked on it. You could hear the noise." She told officers that Father said he was "real red." The dispatcher said she wondered if the child was trying to throw up because he had autism. She also said the little boy was not responsive when Father yelled his name, but she wondered if maybe he could not respond due to his autism. She told officers that Father said, "Let me figure out what's going on with him. I'll call you back." However, she said she did not know what occurred after that phone call because her next communication from Father was a Snapchat message saying the child had passed away. At trial, the dispatcher testified that it was obvious during that phone call that Father recognized something was wrong with the child.

One minute after Father's telephone call with the dispatcher ended, video footage shows he entered the second salon. He remained inside for 65 minutes, leaving the children unattended in his vehicle. "Severe child abuse" means "[t]he *knowing* exposure of a child to or the *knowing* failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death[.]" Tenn. Code Ann. § 37-1-102(b)(27) (emphasis added). The Tennessee Supreme Court recently provided a helpful discussion of the "knowing" requirement and different forms of severe child abuse in this version of the statute in *In re Markus E.*, 671 S.W.3d 437, 460-72 (Tenn. 2023). We quote from the Court's discussion at length:

### A. "Knowing" Conduct

The state of mind associated with severe child abuse as defined in section 37-1-102(b)(22)(A)(i) is "knowing." Tenn. Code Ann. § 37-1-102(b)(22)(A)(i) (Supp. 2016). The statutes do not define "knowing." . . . .

Viewing the severe child abuse provision in context, we note that other grounds for termination of parental rights have historically required a showing of a different state of mind, for example, that the parent's act or failure to act was "willful." *See, e.g.*, Tenn. Code Ann. § 36-1-102(1)(A)(i) (Supp. 2016) (requiring a showing that the parent "willfully" failed to visit or "willfully" failed to support the child). The Court interpreted willfulness to require a showing that the parent had the ability to visit or support, and implied a certain amount of intentionality. *See, e.g.*, *In re Adoption of A.M.H.*, 215 S.W.3d [793, 810 (Tenn. 2007)] (holding that the evidence on

- 34 -

the parents' failure to visit did not "support a finding that the parents intentionally abandoned" the child); *see also Willful, Black's Law Dictionary* (11th ed. 2019) ("Voluntary and intentional, but not necessarily malicious"). In contrast, the term "knowing" does not require proof the parent *intended* for the child to suffer abuse or neglect, but instead focuses on the parent's awareness of relevant facts. *See, e.g.*, *Knowing, Black's Law Dictionary* (11th ed. 2019) ("Having or showing awareness or understanding; well-informed").

If the term "knowing" indicates awareness, the question is, awareness of what? Our answer to that question must be consonant with the words that surround "knowing" in the statute. . . .

Here, the statute uses "knowing" as part of the phrase "knowing failure to protect a child from abuse or neglect." Tenn. Code Ann. § 37-1-102(b)(22)(A)(i) (Supp. 2016). While it surely includes actual awareness of abuse or neglect that has occurred, the phrase "knowing failure to protect a child from abuse or neglect" is not limited to that. The term "protect" means to "defend or *guard against* injury or danger" and to "*keep safe.*" *Protect, Shorter Oxford English Dictionary* (6th ed. 2007) (Oxford University Press) (emphasis added). Thus, "protect" includes not only defending but also guarding against danger, *i.e.*, *risk of future injury.* The phrase "failure to protect" is forward-looking; in family law, it means the "refusal or inability of a parent or guardian to *prevent* abuse of a child under his or her care." *Failure (failure to protect), Black's Law Dictionary* (11th ed. 2019) (emphasis added). Thus, the term "knowing" as used in "knowing failure to protect a child from abuse or neglect" must include not only awareness of abuse or neglect that has occurred, but also awareness of facts, circumstances, or information indicating that the child is at risk or in danger of suffering abuse or neglect.

In the context of parental termination cases, our Court of Appeals has discussed how the term "knowing" should be interpreted:

> It is also important to understand the threshold for finding that a parent or caregiver's conduct was "knowing." ... "[K]nowing" conduct by a parent or caregiver is not limited to conduct intended to cause injury:
>
> > The term "knowing" as used in Section 37-1-102(b)(23) is not defined by statute.... [T]he term has been described as follows:
> >
> > We consider a person's conduct to be "knowing," and a person to act or fail to act "knowingly," when he or she has actual

- 35 -

> knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her.

*In re S.J.*, 387 S.W.3d [387 S.W.3d 576, 592 (Tenn. Ct. App. 2012)] (quoting *In re Samaria S.*, 347 S.W.3d at 206) (emphasis and internal citations omitted). "Persons act 'knowingly' when they have specific reason to know the relevant facts and circumstances but deliberately ignore them." *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *7 (Tenn. Ct. App. July 13, 2004); *see also In re H.L.F.*, 297 S.W.3d 223, 237 (Tenn. Ct. App. 2009) ("By deliberately and recklessly ignoring Father's pedophilic interests, Mother knowingly failed to protect Heather from being raped by Father....").

This interpretation of "knowing" traces back to *In re R.C.P.*, 2004 WL 1567122 at *7, in which then-Judge Koch adopted a definition articulated by the West Virginia Supreme Court in *West Va. Dep't. of Health & Hum. Res. ex rel. Wright v. Doris S.*, 197 W.Va. 489, 475 S.E.2d 865 (1996). The West Virginia court explained that the statutory term "knowingly" as used in the West Virginia definition of child abuse "does not require that a parent actually be present at the time the abuse occurs, but rather that the parent was presented with sufficient facts from which he/she could have and should have recognized that abuse occurred." *Id.* at 878-79. Thus, the evidence is generally required to show the parent was presented with facts, circumstances, or information that would alert a reasonable parent to take affirmative action to protect the child. *See id. See also R.S. v. Dep't of Child.*, 831 So. 2d 1275, 1278 (Fla. Dist. Ct. App. 2002) ("In order for the father to have failed to protect, there must have been evidence that he had the capability to prevent the abuse. This by necessity requires proof that he knew or should have known of the mother's conduct and resulting injury to" the child); *In re P.N.T.*, 580 S.W.3d 331, 355 (Tex. App. 2019) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards.").

Applying Tennessee's severe child abuse statute, our intermediate appellate court has found "knowing" failure to protect even absent proof that the parent was actually aware that abuse or neglect had occurred. Under this standard, the requisite awareness is of facts, circumstances, or information that would have triggered a reasonable parent's duty to take affirmative action to protect the child from abuse or neglect. If the parent has been presented with such facts, circumstances, or information and recklessly disregards them, the parent's failure to protect can be considered knowing. *See, e.g., In re Samaria S.*, 347 S.W.3d at 206-07 (proof supported finding

- 36 -

that intellectually-challenged mother had enough ability to recognize the importance of facts presented to her and appreciate the risk of abuse or neglect to her children, and thus supported finding that her neglect was knowing); *In re Aleksandree M.M.*, No. M2010-01084-COA-R3-PT, 2010 WL 3749423, at *3 (Tenn. Ct. App. Sept. 27, 2010) (while there was no evidence the mother saw the boyfriend's sexual abuse of daughter, proof showed mother ignored risk implicit in incidents such as her boyfriend's lewd comments about young girls in mother's presence, and his request for permission to "court" mother's daughter); *In re Estrella A.*, No. M2022-00163-COA-R3-PT, 2022 WL 17091958, at *7 (Tenn. Ct. App. Nov. 21, 2022) (mother had been abused by her own father, knew his propensity toward sexual abuse, was warned to prohibit contact between maternal grandfather and her children, and yet still lived with children in sister's home with grandfather and exposed children to risk of abuse).

Similarly, a parent's failure to protect can be considered knowing if the parent was deliberately ignorant, as where the parent avoids actual knowledge of the abuse or neglect but is aware of facts, circumstances, or information that would put a reasonable parent on notice of the risk and the need to protect the child. *See, e.g.*, *In re Tamera W.*, 515 S.W.3d 860, 875 (Tenn. Ct. App. 2016) (father would often leave the home when mother began beating children); *In re S.J.*, 387 S.W.3d at 593 (mother ignored admonition by healthcare provider that infant was underweight and needed to be examined by a physician, did not take the child to be seen by a physician, and continued to starve the child); *In re Caleb J.B.W.*, No. E2009-01996-COA-R3-PT, 2010 WL 2787848, at *6 (Tenn. Ct. App. July 14, 2010) (when mother noticed child's injuries after leaving him in care of her boyfriend, she chose to believe her boyfriend's explanation that child fell while they were playing).

. . . .

Accordingly, we agree with the Court of Appeals and hold that, in the context of severe child abuse, a person's conduct is considered "knowing," and a person is deemed to "knowingly" act or fail to act, when "he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her." *In re S.J.*, 387 S.W.3d at 592 (citing *In re R.C.P.*, 2004 WL 1567122, at *7). Under this standard, the relevant facts, circumstances, or information would alert a reasonable parent to take affirmative action to protect the child. For deliberate ignorance, persons can be found to have acted knowingly "when they have specific reason to know" the relevant facts, circumstances, or information "but deliberately ignore them." *In re R.C.P.*, 2004 WL 1567122, at *7. For reckless disregard, if the parent has been presented with the relevant facts, circumstances, or information and recklessly disregards them, the parent's failure to protect can

be considered "knowing."

### B. Severe Child Abuse by Commission or Omission

"Severe abuse" encompasses two different forms of severe child abuse, both equally culpable. One involves commission and the other involves omission. The commission form is defined as "exposure of a child" to "abuse or neglect that is likely to cause serious injury or death," or the "use of force on a child that is likely to cause serious bodily injury or death." Tenn. Code Ann. § 37-1-102(b)(22)(A)(i) (Supp. 2016). The omission form is defined as "failure to protect a child" from such abuse, neglect, or use of force. *Id.* Severe child abuse can be either or both.

*Id.* at 460-65 (footnotes omitted). The Court also explained:

Under the clear and convincing evidence standard, it is important to distinguish between the specific facts found by the trial court and the combined weight of those facts. Each specific underlying fact need only be established by a preponderance of the evidence. Such specific underlying facts include whether a particular injury suffered by the child was the result of nonaccidental trauma, and whether the caregiver's conduct with respect to the injury was "knowing." Once these specific underlying facts are established by a preponderance of the evidence, the court must step back to look at the combined weight of all of those facts, to see if they clearly and convincingly show severe child abuse.[10]

*In re Markus E.*, 671 S.W.3d at 457 (quoting *In re S.J.*, 387 S.W.3d at 591-92). Thus, "[t]he specific underlying facts, including whether the parent's conduct with respect to the child's injuries was 'knowing,' 'need only be established by a preponderance of the evidence.'" *In re Emmalyn H.*, No. E2022-00710-COA-R3-PT, 2023 WL 3411598, at *5 (Tenn. Ct. App. May 12, 2023) (quoting *In re S.S.*, No. E2021-00761-COA-R3-PT, 2022 WL 1151424, at *8 (Tenn. Ct. App. Apr. 19, 2022)).

On appeal, Mother and Stepfather argue that the trial court failed to consider the alternative definitions of "knowing," including whether there was reckless disregard or deliberate ignorance. We agree. The trial court simply found that Father did not "do anything to knowingly or intentionally cause any harm to his children." However, as the Court explained in *In re Markus E.*, "'[k]nowing' conduct by a parent or caregiver is not

---

[10] Notably, "[t]he burden of proof is not 'beyond a reasonable doubt.' Clear and convincing evidence is a higher threshold than a preponderance of the evidence but it is less than beyond a reasonable doubt." *In re E.Z.*, No. E2018-00930-COA-R3-JV, 2019 WL 1380110, at *18 (Tenn. Ct. App. Mar. 26, 2019).

limited to conduct intended to cause injury." 671 S.W.3d at 461 (quoting *In re S.J.*, 387 S.W.3d at 592). In this context, "the term 'knowing' does not require proof the parent *intended* for the child to suffer abuse or neglect, but instead focuses on the parent's awareness of relevant facts." *Id.* "[A] person is deemed to 'knowingly' act or fail to act, when 'he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her.'" *Id.* at 464-65. "Under this standard, the relevant facts, circumstances, or information would alert a reasonable parent to take affirmative action to protect the child." *Id.* at 465. The term "knowing" includes "awareness of facts, circumstances, or information indicating that the child is at risk or in danger of suffering abuse or neglect." *Id.* at 461. "If the parent has been presented with such facts, circumstances, or information and recklessly disregards them, the parent's failure to protect can be considered knowing." *Id.* at 462. "Similarly, a parent's failure to protect can be considered knowing if the parent was deliberately ignorant, as where the parent avoids actual knowledge of the abuse or neglect but is aware of facts, circumstances, or information that would put a reasonable parent on notice of the risk and the need to protect the child." *Id.* at 463.

We conclude that Father was, at the very least, deliberately ignorant or recklessly disregarding the facts. In fact, we conclude that Father had actual knowledge of relevant facts and circumstances "that would have triggered a reasonable parent's duty to take affirmative action" to protect Brother from neglect. *Id.* at 462. Father told the dispatcher, when he returned to the truck after his first salon visit, that "something's wrong." Father knew that Brother, a four-year-old autistic nonverbal child, was breathing funny and either choking or trying to throw up, and that he had turned red. He also knew that two-year-old Braxton had already vomited. Still, Father left the children alone again, for over an hour, while he went inside for a haircut, and this resulted in Brother's death.

This is not the first time that this Court has had occasion to consider the issue of severe child abuse in relation to a child left unattended in a vehicle. In *In re Thomas P.*, No. E2005-01367-COA-R3-PT, 2006 WL 1491610, at *1 (Tenn. Ct. App. May 31, 2006) *perm. app. denied* (Tenn. Sept. 5, 2006), we considered the termination of parental rights of a mother who had left her three-year-old daughter alone in a car for two hours while she was drinking at a brewery. The mother pled guilty to child neglect and received a sentence of two years. *Id.* Her parental rights to the child were terminated. *Id.* The mother later gave birth to a second child and left him unattended in a parked car for several hours outside of an apartment complex. *Id.* Eventually, a petition was filed to terminate the mother's parental rights to the second child based on her guilty plea and sentence for neglect of the first child. *Id.* The petition was based on the ground for termination found in Tennessee Code Annotated section 36-1-113(g)(5), which stated, in pertinent part:

> (5) The parent [] has been sentenced to more than two (2) years' imprisonment for conduct against the child who is the subject of the petition,

or for conduct against any sibling or half-sibling of the child or any other child residing temporarily or permanently in the home of such parent[], that has been found under any prior order of a court or that is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102(b)(21).
. . .

*Id.* at *3. "Severe child abuse" was defined as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great bodily harm or death." *Id.* (quoting Tenn. Code Ann. § 37-1-102(b)(21)(A)). According to the mother's arrest warrant, she had left her three-year-old child alone in a vehicle for several hours while she was drinking in the brewery. *Id.* at *4. The child had no food or water, she had feces in her hair, and there was vomit in the vehicle. *Id.* We held:

> Looking at these facts, we cannot say that the evidence preponderates against a finding that this conduct constitutes severe child abuse, which has been defined, in part, as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm." See Tenn. Code Ann. § 37-1-102(b)(21)(A). The facts to which she offered her plea of guilty clearly show "abuse or neglect that is likely to cause great bodily harm." To recite the facts is to establish the requisite factual predicate. Under the facts of this case, the plea and the warrant say it all, and a sad story it is indeed.

*Id.*[11] In the best interest analysis, we also agreed with the trial court's conclusions that the mother's "act of leaving [her second child] unattended in a parked car in a parking lot amounted to 'knowing exposure of a child to abuse or neglect that is likely to cause great bodily harm or death'; that this behavior 'was extremely dangerous to the child'; and that Mother 'committed severe child abuse against this child.'" *Id.* at *6.

In another case, we affirmed a trial court's finding that the ground of severe child abuse was proven based on an incident involving lack of supervision at a park:

> The Juvenile Court's finding of severe child abuse was based upon the

---

[11] "A lasting injury is not required to sustain a finding of severe child abuse." *In re Whisper B.*, No. M2023-01313-COA-R3-PT, 2024 WL 4851265, at *5 (Tenn. Ct. App. Nov. 21, 2024) (quoting *In re Emmalyn H.*, 2023 WL 3411598, at *6); *see, e.g.*, *In re Clara A.*, No. E2022-00552-COA-R3-PT, 2023 WL 1433624, at *7 (Tenn. Ct. App. Feb. 1, 2023) ("[T]he child, then just shy of her fourth birthday, was unclothed and unrestrained in the back of a stolen vehicle during a police chase that lasted approximately thirty minutes and reached speeds up to eighty-five miles per hour. . . . Fortunately, here the child suffered no physical harm from the perilous situation in which she was placed, but that does not reduce the risk of harm she faced. . . . Mother chose to engage in behavior that any reasonable person would conclude subjected the child to a great risk of harm.").

incident at the park where Father injected drugs intravenously and let the Children roam unattended for several hours. The record on appeal does not show that the Children physically were harmed during the episode. Nevertheless, the Children were exposed to serious dangers including serious bodily injury or death. Father's car, which was accessible to the Children, was littered with syringes and dangerous prescription medication. Father left his fifteen year old daughter, who struggles with a learning disability, to fend for herself and her six year old sibling for hours while he proceeded to abuse drugs. This shockingly irresponsible incident did not occur by chance. Father chose to embark on this sordid expedition, and in so doing, he exposed Kaitlin and Tanner to extreme and self-evident risks. It was only a matter of luck that Kaitlin and Tanner did not suffer serious bodily injury. We find, as did the Juvenile Court, that the ground of severe child abuse is proven against Father by the standard of clear and convincing evidence.

*In re Kaitlin W.*, No. E2015-01553-COA-R3-PT, 2016 WL 2931326, at \*9 (Tenn. Ct. App. May 16, 2016).

Finally, we deem instructive this Court's decision in *In re Azay C.*, No. W2022-01156-COA-R3-JV, 2024 WL 2797416, at \*1 (Tenn. Ct. App. May 31, 2024), which was an appeal of a trial court's severe abuse finding against a mother after one of her children was killed in a car accident while she was driving and the children were not properly restrained. The children were ages nine, five, and seven months, and the nine-year-old died in the accident. *Id.* The trial court found that the children were the victims of severe child abuse due to the mother's "lack of supervision," which led to the death of one child and caused the others to be injured. *Id.* at \*3. On appeal, the mother argued that her conduct was not knowing. *Id.* at \*5. We disagreed. We concluded that the petitioner "presented clear and convincing evidence that, at a minimum, Mother was 'presented with the relevant facts, circumstances, or information and recklessly disregard[ed] them.'" *Id.* at \*7 (quoting *In re Markus E.*, 671 S.W.3d at 465). We explained:

Tennessee law provides that "[a]ny person transporting any child ... is responsible for the protection of the child" by ensuring that the child is properly restrained in accordance with the child's weight and age. Tenn. Code Ann. § 55-9-602. And a parent is responsible for a child's safety, even if he or she is not the driver. See Tenn. Code Ann. § 55-9-602(g)(5)(A) ("If the driver is neither a parent nor legal guardian of the child and the child's parent or legal guardian is present in the vehicle, the parent or legal guardian is responsible for ensuring compliance with this subsection (g)."). For a child under one year old, such as Azay, this means that the person must "properly us[e] a child passenger restraint system in a rear facing position[.]" Tenn. Code Ann. § 55-9-602(a)(1). Older children may be required to be restrained by "properly using a belt positioning booster seat system," depending on the

- 41 -

child's weight. Tenn. Code Ann. § 55-9-602(a)(3). And any child under the age of twelve must be protected by "properly using a seat belt system[.]" Tenn. Code Ann. § 55-9-602(g)(1)(A). Thus, Tennessee law places a clear duty on a person driving a vehicle to ensure that a child is protected by utilizing proper safety restraints.

Mother admitted to knowing about the child safety laws because she claimed at trial that Monroe and Jaliya weighed too much to be required to use booster seats. *See also In re Keri C.*, 384 S.W.3d 731, 746 (Tenn. Ct. App. 2010) (holding, in the context of the duty to visit and support that "persons are presumed to know the law, and a parent should know that she has such responsibilities for her child"). But regardless of Monroe's and Jaliya's weights, their ages required that they at least be restrained with a seat belt. And Azay's age required that he be "properly" restrained in a car seat. Tenn. Code Ann. § 55-9-602(a)(1). As discussed above, however, the evidence supports a finding that the older children were not wearing seat belts at the time of the accident and that Azay's car seat was not properly secured. So then, Mother, as the driver of the automobile and the parent of the children, had a known duty to ensure that her children were protected by age-appropriate safety restraints. In failing to ensure that the children were properly restrained, Mother recklessly disregarded that duty. As a result, the children suffered injuries ranging from mild to catastrophic.

In sum, the proof does not preponderate against the trial court's finding that the children were unrestrained in the automobile at the time of the accident. Clear and convincing evidence also supports the trial court's finding that Mother recklessly disregarded a known duty in failing to ensure that her children were restrained, as required by Tennessee law. Thus, Mother knowingly exposed the children to neglect that not only had the likelihood of causing serious injury or death, but in fact did result in the death of one of her children. As a result, the trial court did not err in concluding that Mother was guilty of severe child abuse under Tennessee Code Annotated sections 37-1-129(b)(2) and 37-1-102(b)(27).

*Id.*

Similarly, Father violated Tennessee law by leaving the children unattended in a motor vehicle on three occasions that day.  Tennessee Code Annotated section 55-10-803(a) provides:

It is an offense for a person responsible for a child younger than seven (7) years of age to knowingly leave that child in a motor vehicle located on public property or while on the premises of any shopping center, trailer park, or any apartment house complex, or any other premises that is generally frequented by the public at large without being supervised in the motor

vehicle by a person who is at least thirteen (13) years of age, if:

(1) The conditions present a risk to the child's health or safety;

(2) The engine of the motor vehicle is running; or

(3) The keys to the motor vehicle are located anywhere inside the passenger compartment of the vehicle.

Father, at a minimum, recklessly disregarded that known duty, even though he knew that both children were in distress, particularly Brother, when he returned to his vehicle. Thus, we conclude that Father "knowingly exposed the children to neglect that not only had the likelihood of causing serious injury or death, but in fact did result in the death of one of [his] children." *See In re Azay*, 2024 WL 2797416, at *7. We further conclude that Father knowingly failed to protect the children from neglect. The term "protect" means to "defend or *guard against* injury or danger" and to "*keep safe.*" *In re Markus E.*, 671 S.W.3d at 461. Father was aware of facts that "would alert a reasonable parent to take affirmative action to protect the child." *Id.* at 465. We have no serious or substantial doubt that the combined weight of the facts establishes severe child abuse by clear and convincing evidence.

### B. Best Interest

If at least one ground for termination has been proven by sufficient evidence, "the court next determines whether the proof amounts to clear and convincing evidence that terminating parental rights is [in] the best interests of the child." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (citing *In re Carrington H.*, 483 S.W.3d at 523). Tennessee Code Annotated section 36-1-113(i) provides twenty statutory factors to be considered in determining whether termination is in the best interest of the child, which we will set forth in detail below. In addition, our supreme court has explained:

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case

ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d at 681-82.  We will examine each factor in turn.

(A)  The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

Regarding this factor, the trial court found that Braxton was four years old at the time of trial, Father and Mother both live in the same general community, and "[Braxton] having a relationship with his Father and with his Father's extended family will be beneficial to the Child as he grows and matures."  It found that "[Father] can provide Child with a stable environment in which to grow, just as Petitioners can."  The trial court did not state whether this factor weighed in favor of or against termination.

We readily conclude that this factor weighs heavily in favor of termination of parental rights.  Factor (A) recognizes that a child has a "critical need for stability and continuity of placement."  Tenn. Code Ann. § 36-1-113(i)(1)(A).  We must consider Braxton's need for continuity and stability from his perspective.  By all accounts, Braxton is thriving.  He had been living with Mother and Stepfather for two years at the time of trial, which was roughly half his life.  This is certainly the most stable home where Braxton has ever lived, given the residential and financial instability and verbal altercations Mother and Father experienced during the marriage.  By the age of four, Braxton had resided at eight different addresses in four different cities.  While the trial court speculated that Father will be able to provide Braxton "with a stable environment" in the future, that remains to be seen.  He did not provide a particularly stable environment prior to his arrest, Mother and Stepfather provided for Braxton throughout Father's incarceration, and in the year since Father's release, he had already held three different jobs and moved in with a new fiancée and her child.  Father is now a stranger to Braxton.  In the absence of termination, Braxton will begin visits with absolute strangers, certainly causing instability in his life.  In our view, terminating Father's parental rights would clearly have a positive effect on Braxton's "critical need for stability and continuity of placement" throughout minority.  *See, e.g.*, *In re Mitchell C.*, No. E2023-01803-COA-R3-PT, 2024 WL 4542967, at *7 (Tenn. Ct. App. Oct. 22, 2024) ("Father maintained that he simply wants to reinstate his visitation and begin the process of transitioning the Child to living with Father full time.  Respectfully, however, Father's proposed plan does not provide stability or continuity for the Child."); *In re Mia C.*, 2024 WL 4003297, at *24 (concluding that factor (A) weighed in favor of termination where "the Child had formed a meaningful parent-child relationship with Stepfather and that the stability of the Child's life and routine would be affected by a reintroduction to the understanding of Father as her parent").

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

Regarding this factor, the trial court simply stated that it "does not find that reuniting Child with [Father] in this case will have any significant adverse effect on the Child's emotional, psychological, and/or medical condition." We cannot agree. Braxton views Mother and Stepfather as his parents and the other children in the home as his siblings. This is the only family he knows. He refers to Stepfather as "Dad." He has not spoken of Father in two years and does not recognize him.

This Court has recognized that a change of caretakers to someone who is essentially a stranger would likely cause emotional harm to the child. *See, e.g.*, *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *19 (Tenn. Ct. App. July 22, 2020) ("[Father] . . . has not interacted with the child for years by the time of the termination trial. Further, the child is well-adjusted to his current living arrangements and uses the term 'Daddy' to describe Step-Father. Father even conceded during testimony that such a transition would be 'hard' on his son. Thus, if termination were denied and even simply visitation with Father ordered, a temporary change in caretakers would occur that would place the child in the custody of someone currently seen as a stranger and would likely cause emotional and psychological harm to him. While Father believes that the child could adjust to those circumstances, the simple fact is that the child would admittedly be harmed by such a transition."). Thus, "courts have affirmed a trial court's finding that a change of caretakers and physical environment would support parental termination when a parent without a meaningful relationship attempted to establish a new relationship with the child." *Id.* at *19. *See also In re Bentley R.*, No. W2023-01665-COA-R3-PT, 2024 WL 3443817, at *11 (Tenn. Ct. App. July 17, 2024) (finding this factor weighed in favor of termination where the child had only brief interactions with the mother and would likely be confused and disturbed by "being in the care of a virtual stranger and taken from the only home and parents he recognizes"); *In re Kailyn B.*, No. E2021-00809-COA-R3-PT, 2022 WL 9577148, at *14 (Tenn. Ct. App. Oct. 17, 2022) ("The child has not seen Mother for roughly half of her life. The testimony at trial was that the child calls Stepmother 'Mom' and has not asked about Mother or Mother's family since going to live with Father and Stepmother. At this point, no meaningful relationship remains between Mother and the child. It is therefore highly likely that reintroducing the child to Mother now would have serious negative effects on the child's emotional or psychological condition.") (citations omitted); *In re London B.*, No. M2019-00714-COA-R3-PT, 2020 WL 1867364, at *12 (Tenn. Ct. App. Apr. 14, 2020) ("Because of Father's lack of relationship with the child, the evidence also shows that a change in caretakers would have a devastating effect on the child, removing her from the parents she knows and essentially placing her with a stranger."). We similarly conclude that a change of caretakers and physical environment would have a negative effect on Braxton's emotional and psychological condition, and this factor weighs in favor of termination.

<u>(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;</u>

Regarding this factor, the trial court found that "[d]ue to circumstances beyond his control, [Father] was not been able to demonstrate continuity and stability in meeting the Child's basic material, educational, housing, and safety needs during the period of his incarceration." We are frankly baffled by this statement. We cannot find that Father's one-year period of incarceration was due to circumstances beyond his control. The fact remains that Father left his four-year-old autistic nonverbal son and two-year-old Braxton unattended in a vehicle for nearly two hours on the day Brother died, in order for Father to get his haircut and eyebrows waxed. That was illegal. As a former police officer, Father knew that. After a lengthy investigation by law enforcement, Father was charged with crimes involving his care of the children, or lack thereof, and was incarcerated. Before his trial, he pled guilty to two counts of leaving a child unattended in a motor vehicle and was sentenced to six months in the county jail on each count. His incarceration was certainly not due to circumstances beyond his control. In fact, Father admitted as much at trial:

> Q.    And leading up -- regardless of all this, as we sit here today, you have not laid eyes on your son for two solid years, correct? And that is because of your own conduct. Don't you agree with that?
> A.    Well, you got to be a little bit more specific than that.
> Q.    Well, you got incarcerated for leaving the boys unattended and one of them passing away, correct?
> A.    Correct.
> Q.    Nobody else did that to you, correct?
> A.    Correct.
> Q.    You served that period of incarceration, a one-year period, correct?
> A.    Correct.
> Q.    You got released and you say you didn't have any money and you didn't have -- you couldn't get back in front of the Court. That was – that's your circumstances, correct?
> A.    Correct.

When analyzing this factor, the trial court recognized that Father did not demonstrate continuity and stability in meeting Braxton's basic material, educational, housing, or safety needs during the period of his incarceration, but it found that Father "did do all of those things prior to his arrest" and said "[t]he Court expects that [he] will continue to provide for those needs once the remaining visitation issues in this case have been resolved." The court found that Father, since his release, had become gainfully employed, was engaged to be married, and it "appear[ed] to the Court that [he] can provide [Braxton] with a satisfactory and stable home environment in which they can renew their relationship." In making these findings, the trial court focuses primarily on what it predicts will occur in the future, not the evidence of what actually has occurred in the past.

- 46 -

Returning to the language of the statute, we are directed to consider "[w]hether the parent *has demonstrated continuity and stability* in meeting the child's basic material, educational, housing, and safety needs." Tenn. Code Ann. § 36-1-113(i)(1)(C) (emphasis added). We conclude that Father has not. Braxton was not provided with housing stability during his parents' marriage. Considering the circumstances of August 21, we cannot conclude that Father has "demonstrated continuity and stability in meeting . . . [Braxton's] safety needs." And, furthermore, Father has not met *any* of the child's material, educational, housing, or safety needs during the past two years. Yet, Father testified that he "resumed some sense of financial stability pretty quickly" and said he and his fiancée "both had a good income and everything." We find that this factor weighs in favor of termination.

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

For this factor, the trial court found that Father and Braxton "have not been able to develop and secure a healthy parental attachment since his incarceration, but, based upon [Father's] and the Childs previous relationship, the Court believes there is a reasonable expectation that [Father] can create such an attachment quickly once given the opportunity."

We again conclude that this factor weighs in favor of termination. It is undisputed that Braxton and Father do not have a secure and healthy parental attachment. They have no relationship whatsoever. Braxton had not seen Father since the day he was arrested in 2022. The remaining issue is whether there is "a reasonable expectation that the parent can create such attachment." Tenn. Code Ann. § 36-1-113(i)(1)(D). We are not convinced that such an attachment can be created "quickly," as the trial court found, given that Father is presently a complete stranger to Braxton, the circumstances surrounding Brother's death, and the animosity that exists between Mother and Father. Father has not demonstrated an ability to cooperate with Mother on custody issues in the past. On the date of Brother's death, he had the boys because he had unnecessarily obtained an order of protection prohibiting Mother from having the children. He also unilaterally withheld visits with her prior to his arrest. And notably, Father never even informed Mother that he had left the children alone in the vehicle, leaving Mother to discover this fact during his criminal trial over one year later. Reintroducing Father into Braxton's life at this point would be very difficult for everyone involved, particularly Braxton. We therefore have serious doubts as to whether there is a reasonable expectation that a healthy and secure parental attachment can be created at this point.

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

The trial court found that Father "has not been able to maintain regular visitation or other contact with the Child" during his period of incarceration and after release because of the parenting plan allotting him zero days. However, the trial court stated that it "expects that Respondent will utilize his visitation time to cultivate a positive relationship with the Child going forward." We agree that Father was not permitted to visit or contact Braxton during his period of incarceration due to a no-contact provision that was apparently requested by the State. However, that order was lifted upon his release. Father was released on February 3, 2023. He did not file a petition to modify the parenting plan until June. True, Father contends that he lacked the resources to pay an attorney. However, he had purchased a $35,000 truck in April and was apparently paying half the mortgage, cell phone, internet, cable, groceries, and utilities at the home he shares with his fiancée and her son.

"Viewed from the perspective of [a child], however, the reasons for the lack of visitation 'matter little.'" *In re Greyson D.*, No. E2020-00988-COA-R3-PT, 2021 WL 1292412, at *12 (Tenn. Ct. App. Apr. 7, 2021) (quoting *In re Johnathan M.*, 591 S.W.3d 546, 562 (Tenn. Ct. App. 2019), *perm. app. denied* (Tenn. Apr. 2, 2019)) (discussing this best interest factor under the previous version of the statute and noting that the mother was under a no-contact order but explaining that "the plain language of this best interest factor does not require that Mother's failure be willful"). The lack of contact between Father and Braxton, coupled with his young age, has resulted in no meaningful relationship, so this factor weighs in favor of termination. *See id.*

(F) Whether the child is fearful of living in the parent's home; and

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

Regarding these factors, the trial court noted that Mother and Stepfather have not discussed Father or the circumstances of August 21 with Braxton at all, so they are not certain that Braxton is even aware of Father's existence. The trial court found that Braxton does not appear to have any post-traumatic symptoms from the incident, although he was somewhat anxious and had night terrors for a period of time. The trial court did not believe that reunification was likely to cause Braxton to experience any trauma or post-traumatic symptoms. It found no evidence that Braxton was "fearful" of Father based on what occurred on the date of Brother's death, although he noted that Mother and Stepfather were fearful of Father due to what occurred. The trial court deemed the fears of Mother and Stepfather "unreasonable" and said it appeared they were expressed in an effort to have the trial court punish Father "for what they perceive as his wrongdoing on August 21, 2021 when a Madison County jury would not." The trial court stated that one parent's desire to punish another is not a factor in a termination proceeding.

We deem these factors neutral. Braxton is not fearful of Father because he does not

know him.  It is not known, at this point, whether Father will "trigger" Braxton's experience of trauma or post-traumatic symptoms.  *See In re Bentley R.*, 2024 WL 3443817, at *12 ("This Court has previously affirmed a trial court's decision to weigh these two factors neutrally in the absence of evidence."); *In re Evandor C.*, No. M2022-01697-COA-R3-PT, 2024 WL 678014, at *17 (Tenn. Ct. App. Feb. 20, 2024) (agreeing with the trial court that these factors weighed neutrally when it was "unknown whether he is fearful of living in the parent's home or whether he was traumatized").

We do not deem the trial court's finding regarding whether *Mother's* fear of Father was "reasonable" to be relevant to these two factors, especially since the court found that Mother and Stepfather have not discussed the tragic events with Braxton.  However, to the extent it was properly considered as a "catch-all" factor, we disagree with the court's conclusion.  Father needlessly obtained an order of protection against Mother, preventing her from having contact with the children that day.  He then left the children in his truck all morning while he got his haircut and eyebrows waxed.  He was on the phone with his dispatcher friend from the time he awoke until he reached Jackson and again between the two salon visits.  After the first 40-minute visit, Father saw that his younger son had thrown up on himself, and the older was red-faced and trying to throw up.  Still, Father went into another salon for 65 minutes, leaving both children in the vehicle with their snacks.  Brother died as a result.  Father never even told Mother that he left the children alone in the car that day.  As a result, we deem Mother's inability to trust Father with Braxton, age four at the time of trial, entirely reasonable.

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

The trial court found that Braxton has created a healthy parental attachment with Stepfather in Father's absence.  It noted that they have a good relationship, which "is to be commended."  However, the trial court stated "the Court does not find that this healthy parental relationship favors termination of [Father's] parental rights, as the Child's healthy parental attachment with [Stepfather] does not lessen the Child's previous attachment or anticipated attachment with [Father]."

We conclude that this factor weighs in favor of termination.  Looking at Braxton's current circumstances, it is undeniable that he "has created a healthy parental attachment" with Stepfather and has none with Father.  The proof showed that Braxton considers Stepfather his father and refers to him as his Dad.  Stepfather cares for him when he is sick, takes him to doctor's appointments, picks him up from daycare every day, and coaches his t-ball team. Further, the trial court's statement that "…the Child's healthy parental attachment with [Stepfather] does not lessen the Child's previous attachment or anticipated attachment with [Father]" is flawed in two respects.  First of all, Braxton's healthy parental attachment with Stepfather *did* lessen and in fact replaced Braxton's previous attachment with Father.  Father's previous attachment is now nonexistent. It is undisputed that the

- 49 -

Child had a parental attachment to Father at one time, but he no longer does. "[T]he potential of any future relationship does not negate the absence of a meaningful relationship in the present." *In re Braelyn S.*, 2020 WL 4200088, at *19. Secondly, the trial court's finding regarding Father's "anticipated attachment" misplaces the intended prescribed analysis required by this factor – "[w]hether the child *has created* a healthy parental attachment with another person or persons in the absence of the parent." (emphasis added). The child's situation as it exists at the time of trial is that, in the absence of Father, he does have a healthy attachment to Stepfather.

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

The trial court acknowledged that Braxton has a good relationship with Stepfather's other children but nevertheless said this factor "does not weigh in favor of termination" because the court did not anticipate a severance of those relationships as a result of the court's ruling. Braxton has lived with Stepfather's two older children for two years and considers them his siblings. At the time of trial, Mother and Stepfather also had a six-month-old child, who was Braxton's half-sibling. Thus, this factor weighs in favor of termination. That conclusion is supported by controlling caselaw. *See, e.g.*, *In re Miriam T.*, 2025 WL 2591395, at *19 (noting the "close sisterly connection the child has with Stepmother's daughters" as a factor weighing in favor of termination); *In re Keigen D.*, No. M2023-01555-COA-R3-PT, 2024 WL 4274379, at *8 (Tenn. Ct. App. Sept. 24, 2024) (finding this factor weighed heavily in favor of termination where "the child is bonded to Stepfather and views him as her parent and her siblings as her family"); *In re Violet R.*, No. E2023-00308-COA-R3-PT, 2024 WL 3580828, at *5 (Tenn. Ct. App. July 30, 2024) (considering that "[t]he child also had a strong attachment to Stepfather's children from his previous marriage" and "developed strong bonds with Stepfather and her new siblings").

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

The trial court found this factor "not applicable in this case" as there was no evidence that either parent had issues with drugs or alcohol and it appeared that Father had "made a successful reentry to life outside of confinement." We agree that this factor is inapplicable but for a different reason. In *In re Johnathan M.*, 591 S.W.3d 546, 550 (Tenn. Ct. App. 2019), this Court considered a termination petition filed by a father and stepmother after the mother was incarcerated. In our discussion of the best interest factors,

we noted that the trial court found that termination was in the best interest of the children considering several factors, including that the mother "made no adjustment of circumstances." *Id.* at 561. We determined that this particular factor "[did] not apply to this case because the Children were not 'removed' from Mother's care, which generally occurs when the children are in the custody of the state and placed in foster care." *Id.* The children in that case "were not 'removed' from Mother's care due to circumstances, conduct, or conditions that made it unsafe to be in Mother's home." *Id.* at 562. Therefore, we found the "adjustment of circumstance" factor inapplicable. *Id.* We will do the same here.

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

The trial court stated that it did not find that this factor weighed in favor of termination because Father "did attempt to take advantage of the court system in order to establish visitation with the Child." We find factor (K) inapplicable. *See In re Emmeline C.*, No. M2024-00567-COA-R3-PT, 2025 WL 841006, at *13 (Tenn. Ct. App. Mar. 18, 2025) ("The trial court found that factor (K), concerning whether the parent had taken advantage of available programs or services, and factor (L), concerning whether the Tennessee Department of Children's Services ("DCS") had made reasonable efforts to assist the parent in making a lasting adjustment, did not apply in this matter. We agree. Mother had been incarcerated during the years that the Child had been in the care of others, and DCS had not been involved.").

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

The trial court found this factor inapplicable. We agree.

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

Regarding this factor, the trial court began by acknowledging that "the Court might expect that someone in Respondent's situation might file a petition to seek visitation with their Child sooner than four months after being released from incarceration." However, the court noted Father's testimony that he did not have the financial means to retain a lawyer. Ultimately, the court found that a four-month delay after a one-year period of incarceration was not unreasonable, and Father's reliance on the permanency plan in effect was reasonable. Thus, the court found that this factor did not weigh in favor of termination.

Father had some familiarity with the court system, having obtained an order of protection against Mother on his own. However, he took no action to respond to the divorce

complaint or participate in those proceedings either before his arrest or during his incarceration. Father received a tax refund of $5,000 to $6,000 while he was incarcerated, although it went onto a card controlled by his father. After Father's release on February 2, 2023, he immediately moved to the home of his current fiancée and her son. His parents bought him a phone and purchased a vehicle for him, although Father testified at trial that it kept having issues. Father resumed working at the factory and purchased a 2017 F-150 for $35,000, assuming payments of $600 per month. He was paying half the mortgage at his fiancée's home and roughly another $1,000 per month toward other bills. He also purchased an engagement ring. He testified at trial that he "resumed some sense of financial stability pretty quickly." At the same time, he merely testified that he met with his lawyer "at some point" regarding the possibility of seeing Braxton but could not afford to pay him at that unspecified time. He never contacted Mother himself. He did not file a petition to modify the parenting plan until June, after Mother filed a petition regarding child support. We conclude that Father's actions did not demonstrate a "sense of urgency" in seeking custody.

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

The trial court found that "[t]here was no evidence presented with regard to this factor at the hearing." We cannot agree. We find that this factor weighs in favor of termination because Father had shown neglect toward both children by leaving them alone in a vehicle for nearly two hours, which led to Brother's death and Braxton's hospitalization. *See, e.g.*, *In re Thomas P.*, 2006 WL 1491610, at *6 (analyzing the previous version of this best interest factor and agreeing with the trial court's findings that "the act of leaving Thomas unattended in a parked car in a parking lot amounted to 'knowing exposure of a child to abuse or neglect that is likely to cause great bodily harm or death'; that this behavior 'was extremely dangerous to the child'; and that Mother 'committed severe child abuse against this child'"). Braxton could have easily succumbed to the same fate.

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

The trial court found that Father "appears to have provided a stable environment for the Child at issue prior to the parties' divorce and prior to his arrest and incarceration," and the trial court noted that it "expects that to be the case in the future based upon the evidence presented at the hearing." We find this factor neutral. It does appear that Father provided safe care for Braxton for two years and Brother for four years, up until the date of Brother's death. However, his failure to provide safe and stable care on that date had fatal consequences. We cannot find that this factor weighs in Father's favor.

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

The trial court found that Father "has demonstrated an understanding of the basic and specific needs required for the Child to thrive in his care and that he is currently on the road to making those things a reality." Looking at what Father "has demonstrated," rather than attempting to predict the future, we find that this factor also weighs in favor of termination. Over the past two years, Father has not demonstrated any understanding of the child's specific needs and what he needs to thrive because they are now strangers to one another. At trial, Father admitted that "he doesn't know who I am[.]" Although Father suggested a transition period where he would be reintroduced to Braxton in "small doses," he conceded that "I don't know how his life has been for the past two years. I don't know any of that." He admitted that "a lot of things changed" since he last saw him on the date of his arrest.

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

The trial court found that this factor did not weigh in favor of termination because "it appears that Respondent is currently engaged and has a stable home in which to exercise visitation with the Child." Due to the lack of evidence about Father's present home, we deem this factor neutral. Father testified that upon his release from incarceration he moved in with his current fiancée and her child, and Braxton has a bedroom set up there. He also testified that he and his fiancée both have "a good income and everything." However, there was surprisingly little testimony about Father's current home (beyond the address) or its current occupants. The fact that Father is engaged to an individual we know nothing about does not mean that he has established a "stable" home for Braxton that will meet his "basic and specific needs and in which the child can thrive." Additionally, there was no evidence that Father has any ownership interest in the subject residence, with Father stating that he immediately moved into his current fiancée's home. From the proof, Father is there as a guest of his fiancée, albeit a paying guest. Should that relationship end, Father would be forced to relocate yet again.

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

The trial court's order states that "it appears that Respondent's home will be suitable for the Child to visit with him and will be a healthy and safe environment for the Child." For the same reasons discussed with respect to the previous factor, we find that this factor is neutral.

(S) Whether the parent has consistently provided more than token financial support for the

child;

The trial court found that Father consistently provided for Braxton's needs prior to his arrest and incarceration, and the court found that Father "currently has suitable employment and is likely to provide more than token financial support for the Child going forward." We find that this factor weighs in favor of termination. This factor requires an examination of what Father "has consistently provided." As this factor recognizes, past actions are evidence, but statements of intent are not. Looking at Father's history, he financially supported Braxton until he was two years old. However, he provided zero support for Braxton during the year that he was incarcerated and zero support for Braxton in the thirteen months between his release and the date of trial. Father testified at trial that even before the termination petition was filed, he and his fiancée both had "a good income." Inexplicably, however, Father had not sent one dime of financial support to Braxton. He knew where Mother lived and could have easily mailed her a check.

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The trial court found that Father is mentally and emotionally stable. We agree. This factor does not weigh in favor of termination.

In conclusion, the central focus in the best interest analysis must remain on what is best for the child, based upon the current situation, not what may seem "fair" or "unfair" to a parent. *See In re Zaniyah C.*, No. E2025-00568-COA-R3-PT, 2025 WL 3458901, at *5 (Tenn. Ct. App. Dec. 2, 2025) ("the focus of the best interests analysis is not the parent but rather the child"); *In re Bentley W.*, No. E2024-01795-COA-R3-PT, 2025 WL 2959603, at *13 (Tenn. Ct. App. Oct. 21, 2025) ("We do not doubt that Mother loves Bentley or even that maintaining the parent-child relationship with Bentley may be in Mother's best interest. The General Assembly, however, has charged trial courts in parental termination cases with assessing the best interest of the child — Bentley's best interest, not Mother's best interest."); *In re Alexis F.*, No. M2024-01316-COA-R3-PT, 2025 WL 2158970, at *6 (Tenn. Ct. App. July 30, 2025), *perm. app. denied* (Tenn. Oct. 24, 2025) ("The best interests of the child are at the center of the court's inquiry, not what is best for the parent."). According to the Tennessee Supreme Court,

> When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child...." Tenn. Code Ann. § 36-1-101(d) (2017).

*In re Gabriella D.*, 531 S.W.3d at 681-82. In addition, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2).

Having considered all of the statutory best interest factors, and based upon controlling caselaw and precedent, we find that clear and convincing evidence demonstrates it is in the best interest of Braxton to terminate Father's parental rights. The overwhelming majority of the factors weigh in favor of termination in varying degrees. By the time of trial, Braxton had not seen or heard from Father in two years, which seems like a lifetime for a four-year-old. Father does not have a meaningful relationship with Braxton, and Braxton has developed strong bonds with Stepfather and his new siblings. "This court has repeatedly indicated that often, the lack of a meaningful relationship between a parent and child is the most important factor in determining a child's best interest." *In re Temperance A.*, No. M2023-00641-COA-R3-PT, 2024 WL 2891918, at *21 (Tenn. Ct. App. June 10, 2024), *perm. app. denied* (Tenn. Aug. 9, 2024) (quoting *In re Krisley W.*, No. E2022-00312-COA-R3-PT, 2023 WL 2249891, at *11 (Tenn. Ct. App. Feb. 28, 2023))[12]; *see also In re London B.*, 2020 WL 1867364, at *12 ("In sum, we agree with Father that not all factors weigh in favor of termination in this case. Father's complete lack of relationship with the child, however, weighs heavily in favor of termination. Often, the lack of a meaningful relationship between a parent and child is the most important factor in determining a child's best interest."); *In re Noah B.B.*, No. E2014-01676-COA-R3-PT, 2015 WL 1186018, at *10 (Tenn. Ct. App. Mar. 12, 2015) ("[T]he evidence in this case clearly and convincingly supports the trial court's finding that termination is in Noah's best interest. Noah was four years old at the time of trial. He last saw Mother around his first birthday. He met Stepmother when he was one year old, and since that time, Stepmother has functioned as his mother. . . . The trial court found that Stepmother had been Noah's mother 'for all practical purposes' since late 2011, that Noah had 'no recollection' of Mother, and that there was 'no meaningful relationship' between Noah and Mother. The evidence clearly supports these conclusions. The trial court also found that '[i]t would be a major, traumatic event for Noah' to be introduced to Mother and required to visit with her after he has believed for at least two years that Stepmother is his mother. . . . We affirm the trial court's finding that Noah's best interest would best be served by terminating Mother's parental rights.").

In our view, "[r]e-establishing a [] relationship with Father at this juncture would only disrupt the child's stability." *See In re Violet R.*, No. E2023-00308-COA-R3-PT,

---

[12] *See also In re Bentley W.*, 2025 WL 2959603, at *13; *In re Charles B.*, No. W2020-01718-COA-R3-PT, 2021 WL 5292087, at *11 (Tenn. Ct. App. Nov. 15, 2021); *In re Lauren F.*, No. W2020-01732-COA-R3-PT, 2021 WL 5234712, at *14 (Tenn. Ct. App. Nov. 10, 2021); *In re Christopher L.*, No. M2020-01449-COA-R3-PT, 2021 WL 4145150, at *9 (Tenn. Ct. App. Sept. 13, 2021); *In re Miley D.*, No. M2020-01416-COA-R3-PT, 2021 WL 2948776, at *6 (Tenn. Ct. App. July 14, 2021); *In re Cortez P.*, No. E2020-00219-COA-R3-PT, 2020 WL 5874873, at *12 (Tenn. Ct. App. Oct. 2, 2020).

2024 WL 3580828, at *5 (Tenn. Ct. App. July 30, 2024); *see also In re Chayson D.*, 720 S.W.3d 123, 146 (Tenn. Ct. App. 2023) ("we cannot help but acknowledge the overwhelming sense that the child's life will not be improved by a reintroduction to Mother"). Having carefully reviewed the entire record, we conclude that the facts, viewed as a whole, amount to clear and convincing evidence that termination of parental rights is in the best interest of Braxton. *See In re Neveah M.*, 614 S.W.3d at 680. Considering the best interest of the child, from his perspective, it is clear that termination of parental rights is in his best interest.

## V.  CONCLUSION[13]

For the aforementioned reasons, the decision of the trial court is hereby reversed and remanded. Costs of this appeal are taxed to the appellee, Tyler M., for which execution may issue if necessary.

s/ Carma Dennis McGee
CARMA DENNIS MCGEE, JUDGE

---

[13] While this appeal was pending, Father filed a motion to consider post-judgment facts and a motion to dismiss this appeal, asking this Court to consider the fact that Mother had filed a second petition to terminate parental rights. His motion to consider post-judgment facts was admittedly for this Court "to determine if the pending appeal should be dismissed." He contended that the filing of the second termination petition indicated that the appellants had abandoned the present appeal and rendered this appeal moot. The appellants filed a response, asking this Court not to dismiss the appeal because the second petition was a separate action that should have no effect on this appeal. However, they asserted that "if this Court decides to consider Appellee's Motions," the Court should also consider additional facts they wished to demonstrate. This Court entered an order deferring the motions to the panel of the Court deciding this appeal. Mother and Stepfather subsequently filed a motion requesting consideration of "supplemental" post-judgment facts to include motions filed in the second termination case and the custody matter. This Court entered another order deferring the motion to the panel. Having considered each of the parties' motions, we deny the motions to consider post-judgment facts and deny the motion to dismiss this appeal as moot.